979 A.2d 229

**MARYLAND DEPARTMENT OF TRANSPORTATION**

v.

**Gregory MADDALONE.**

**No. 328, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Aug. 31, 2009.

**550** 

See also 959 A.2d 795.

552

Kathleen E. Wherthey (Douglas F. Gansler, Atty. Gen. (Judith F. Plymyer, Hanover), on brief), Baltimore, for Appellant.

Debra B. Cruz (Levin & Gamn, PA, on brief), Towson, for Appellee.

Panel: DEBORAH S. EYLER, WOODWARD and JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In January 2007, Gregory J. Maddalone, the appellee, was fired from his "Administrator VI" job with the Maryland Department of Transportation ("MDOT"), the appellant. As he acknowledges, that job was the last in a series of patronage positions he held during the administration of Governor Robert L. Ehrlich, Jr., for whom he had worked and campaigned.

Maddalone challenged his termination in the Office of Administrative Hearings ("OAH"), alleging that the dismissal was unconstitutional because it was based on his political affiliation, and therefore was in violation of his rights under the First Amendment to the federal constitution.[1] Following an evidentiary hearing, an administrative law judge ("ALJ") overturned the MDOT's termination decision. The ALJ's ruling was upheld by the Circuit Court for Anne Arundel County in an action for judicial review. The MDOT has now taken an appeal to this Court, posing two questions for review, which we have paraphrased slightly:

I. Did the ALJ err in concluding that Maddalone was unconstitutionally terminated from his state employment?

II. Did the ALJ err by awarding Maddalone reinstatement and back pay, when he was not ready and willing to return to work?

For the reasons we shall explain, we answer Question I affirmatively, and therefore shall reverse the circuit court's judgment with instructions to remand the case to the OAH to issue a final decision upholding Maddalone's termination from

---

1. The First Amendment states in relevant part that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

employment. Question II is rendered moot by our disposition of Question I.

## FACTS AND PROCEEDINGS

Maddalone, a Republican, served as an aide to Congressman Ehrlich beginning in 2000, and actively participated in the political campaign that resulted in his being elected governor of Maryland in November 2002. Governor Ehrlich was the first Republican elected to that post in this state since 1966.[2] Thus, upon Governor Ehrlich's election, there was for the first time in decades a change in Annapolis from an administration of one major political party to another.

At all the relevant times in this case, Maddalone's educational background and work experience were as follows. He held a high school diploma. He did not hold a college degree or any other post-high school degree, and had never attended a four-year college. During his state employment, he earned some credits toward an Associate's Degree at the Community College of Baltimore County. He was a professionally trained and proficient ice skater who had participated successfully in that sport since childhood. His prior work experience, except for his employment as an aide to former Congressman Ehrlich, was as an ice skater, and, more specifically, as an ice dancer.

Maddalone was 27 years old when Governor Ehrlich was elected. Throughout Governor Ehrlich's term, Maddalone was employed in what he acknowledges were state government "patronage" jobs. At the outset of the Ehrlich Administration, on January 15, 2003, Maddalone was hired by the Office of the Governor as an "information technology systems assistant." In October 2003, he became chief of staff to John Gowland, General Manager of the Maryland Transit Authority

---

2. That year, Republican Spiro T. Agnew, the Baltimore County Executive, was elected governor. Agnew did not run for a second term in that office. Instead, he was elected Vice President of the United States on a ticket with President Richard M. Nixon in 1968 and again in 1972. In 1973, he resigned to avoid impeachment after pleading *nolo contendere* to federal charges of tax evasion and money laundering.

("MTA"), a division of the MDOT. A year later, he was transferred to the Maryland Port Authority, another division of the MDOT, to the position of "legislative liaison." Less than a year later, on July 1, 2005, he was hired as an "emergency response manager" at the MDOT headquarters in the Office of Engineering, Procurement and Emergency Services ("OEPES"). Emergency response manager is an "Administrator VI position" for which Maddalone was paid a starting salary of $74,967. It is Maddalone's dismissal from that position, soon after the Ehrlich Administration came to an end, that is the subject of this case.

All the jobs Maddalone held during the Ehrlich Administration were filled without advertisement. Because the positions were not advertised, Maddalone did not submit an application or résumé for any of them, and did not compete against any other people for them. The positions did not carry any educational requirements, such as holding a college or any post-high school degree, or any other necessary qualifications. All the positions were designated in the "Executive Service" [3] and, as Maddalone acknowledges, were "patronage" hires.[4]

---

**3.** Pursuant to Md.Code (1977, 2001 Repl.Vol., 207 Supp.), section 2–103.4(a) of the Transportation Article ("TR"), the Secretary of Transportation may establish a human resources management system for the employees of the MDOT and its units, separate from the State Personnel Management System. The MDOT's Human Resources Management System in fact exists by virtue of Code of Maryland Regulations ("COMAR") Title 11, Subtitle 02 ("Transportation Service Human Resources System"). The categories of employees within the MDOT are established in COMAR 11.02.02.01. The largest category is "Career Service" employees who are hired based on merit and, after a probationary period, only may be terminated for cause. COMAR 11.02.02.01B. "Executive Service" employees cannot be discharged illegally or in violation of their constitutional rights. *Newell v. Runnels*, 407 Md. 578, 608–09, 967 A.2d 729 (2009) (explaining that "at-will" employee cannot be fired or demoted in contravention of constitutional rights); *cf.* COMAR 11.02.02.01C (explaining that Executive Service employees "serve at the pleasure of the appointing authority"; *i.e.*, they are "at-will" employees).

Maddalone became an Executive Service employee under the MDOT's Human Resources Management System on October 27, 2003.

**4.** On October 27, 2003, when Maddalone became an MDOT employee, he signed a letter stating:

In November 2006, Baltimore City Mayor Martin O'Malley, a Democrat, defeated Governor Ehrlich in the Maryland gubernatorial election. On January 17, 2007, the day that Governor O'Malley was inaugurated, he appointed John D. Porcari as the Acting Secretary of the MDOT. As Acting Secretary, Porcari had authority to make the final decision as to whether an Executive Service employee would be terminated. *See* COMAR section 11.02.08.07. Acting Secretary Porcari previously had served as Secretary of the MDOT during the administration of Governor Parris Glendening, a Democrat, until Governor Ehrlich was elected. Acting Secretary Porcari was confirmed as Secretary of the MDOT under the O'Malley Administration on March 6, 2007.[5]

On January 23, 2007, six days after taking office, Secretary Porcari met face-to-face with Maddalone and terminated him from employment. Beverly Swaim–Staley, then Acting Deputy Secretary of the MDOT, was present at that meeting.[6] At

---

- Your Transportation Service status is Executive Service
- Your current classification and class code are Administrator III— 2588 with an annual salary of $63,514.
- Your position:
 -serves at the pleasure of the Secretary of Transportation
 -staffs a significant policy role or provides direct staff support to the offices of the Administrator; and
 -is compensated on neither the executive or standard salary schedules of the Department
- Unlike Career Service, upon termination, any appeal hearing is limited to the legal and constitutional basis for the termination.
 I have read the above and understand I have no entitlement to continued employment in this position. I accept the position in accordance with the terms of employment specified in COMAR 11.02.

5. For ease of discussion, we shall refer to Acting Secretary Porcari as Secretary Porcari.

 Secretary Porcari remained in that position until 2009. On April 10, 2009, President Barack Obama nominated him to be Deputy Secretary of the United States Department of Transportation. He was confirmed in that post on May 21, 2009, and assumed office on June 1, 2009.

6. Acting Deputy Secretary Swaim–Staley was later confirmed as Deputy Secretary. We shall refer to her as Deputy Secretary for ease of discussion. When Secretary Porcari left his position as Secretary of the MDOT, Deputy Secretary Swaim–Staley became Acting Secretary of MDOT, a position she still holds.

the time of the termination, Maddalone was earning an annual salary of $79,309 as an emergency response manager.[7]

Through counsel, Maddalone lodged an appeal of the MDOT's termination action with the Office of Administrative Hearings ("OAH"), pursuant to Md.Code (1977, 2001 Repl. Vol., 2007 Supp.), section 2–103.4(d)(6)(iii) of the Transportation Article ("TR"), and COMAR section 11.02.08.07. He alleged that he had been terminated "for political reasons" in violation of "the First and Fourteenth Amendments to the United States Constitution." He sought reinstatement and full back pay. The MDOT opposed Maddalone's challenge to his termination.

On April 27, 2007, a merits hearing on the matter was held before an ALJ with the OAH. Maddalone was the sole witness in his case. He moved into evidence several documents, including, over objection, 20 newspaper articles posted to the internet chronicling certain events that took place from early 2005 to late 2006. Maddalone maintained that the documents were relevant because they showed the political climate in Maryland in 2005 and 2006, and thus added important context to his testimony. Those events, in summary form, and as testified to by Maddalone, were as follows.

In February 2005, during the Maryland legislative session, Governor Ehrlich came under fire by Democrats in the General Assembly for allegedly politicizing the hiring and firing of state employees. Specifically, the Ehrlich Administration was criticized for firing long-time state employees solely for political reasons and then hiring administration "loyalists" in their places, or in new positions. The Ehrlich Administration responded that the accusations were untrue and politically driven.

There was intense media coverage of the various accusations and responses. Joseph Steffen, an acknowledged mem-

---

7. According to Maddalone, he did not know he was earning a salary of $79,309 at that time. He thought he was earning less than that. He explained that his paychecks were directly deposited and his wife "[took] care of all of the finances."

ber of Governor Ehrlich's inner circle, was the primary focus of controversy with respect to the alleged firing of long-time state employees for political reasons. He was alleged to have been hired into certain jobs with state agencies in order to root out Democrats in state employment for firing. He also was alleged to have been involved in a political smear campaign against Mayor O'Malley, who at that time was Governor Ehrlich's likely opponent in the upcoming 2006 gubernatorial election.

During the 2005 legislative session, there was an effort by Democrats, criticized by Republicans, to eliminate several dozen jobs that (allegedly) had been filled with Ehrlich Administration "loyalists." In that context, information about Maddalone's background was reported repeatedly in the press. He often was cited as a political ally of Governor Ehrlich who was hired into state jobs for which he was not qualified and who, like Steffen, allegedly participated in identifying state employees for firing based upon their political affiliations. Press coverage about Maddalone pointed out that he had only a high school education and that his prior work experience, other than being an aide to former Congressman Ehrlich, was as an ice dancer. Many times he was referenced in news reports as "former ice dancer" Maddalone. For example, in a *Baltimore Sun* article dated March 14, 2005, a commentator, in characterizing the Ehrlich Administration, said:

> [T]he administration that brought a fellow named Gregory J. Maddalone, whose previous work experience was professional ice dancing, and made him the port of Baltimore's legislative liaison.

Michael Olesker, *E–Mails show Steffen not "irrelevant," "mid-level,"* BALTIMORE SUN, March 14, 2005, at 1B.

On August 25, 2005, by Resolution of the Legislative Policy Committee of the General Assembly, a "Special Committee on State Employee Rights and Protections" ("Special Committee") was created to investigate the Ehrlich Administration's hiring and firing practices. The Special Committee was comprised of a bipartisan group of six senators and six delegates,

and was co-chaired by Senator Thomas M. Middleton and Delegate Adrienne A. Jones.

In November 2005, the *Baltimore Sun* conducted a poll for the gubernatorial race that by then was one year away. Some of the questions concerned the allegations of political hiring and firing against the Ehrlich Administration. In answer to one such question, 42% of those polled agreed that "the Ehrlich administration is more interested in rewarding its political friends with jobs than in finding the most qualified people to serve in State government." In an article about the poll, a participant, identified as a Democrat, was quoted as questioning Governor Ehrlich's appointment of "an ice skater for the Port Administration," clearly a reference to Maddalone. Before then, there were reports that Steffen had admitted engaging in certain political smear tactics against Mayor O'Malley, and had resigned from state employment. In a *Baltimore Sun* article about those developments, a commentator called members of the Ehrlich Administration "the people who famously hired Gregory J. Maddalone this year as the Port of Baltimore's legislative liaison" and remarked that Maddalone's "previous experience" was that he was a "[p]rofessional ice dancer." Olesker, *Is Steffen ready to come clean on his dirt?* BALTIMORE SUN, Nov. 1, 2005, at 1B.

By late 2005, the Special Committee was well into hearings to obtain witness testimony for its investigation. The witnesses included members of the Ehrlich Administration such as Human Resources Department Secretary Christopher J. McCabe and Transportation Department Secretary Robert L. Flanagan. Secretary McCabe's testimony that Maddalone often would come to work wearing a T-shirt bearing the signature line from *The Apprentice* television show—"You're fired!"—was widely covered by the press.

On May 11, 2006, Maddalone testified before the Special Committee. He acknowledged having played some role in a process that ultimately led to the firing of five state employees. He responded, although somewhat evasively, to all the questions put to him except 1) one seeking the identity of the

person in the Governor's Appointments Office who had asked him to create a database pertaining to the termination of state employees, and 2) one inquiring as to who was paying his legal fees. On May 12, 2006, the *Baltimore Sun* reported that Maddalone, "an ice dancer and longtime Ehrlich aide who is an emergency response manager at the Department of Transportation, said he helped facilitate five firings at the Maryland Transit Authority." The account went on to report:

> Maddalone, a high school graduate who has been criticized for lacking qualifications, said he is tired of being lampooned: "Am I an ice skater? Yes, I'm very proud of that fact," he said.

Jennifer Skalka, *Political firings denied; 4 Ehrlich administration officials testify at 8–hour legislative hearing*, BALTIMORE SUN, May 12, 2006, at 1B.

Also as reported by the *Baltimore Sun*, on May 23, 2006, a majority of the members of the Special Committee voted to file a lawsuit to compel Maddalone to answer the questions he had declined to answer during his testimony. That same day, in a commentary about the Democratic primary for the gubernatorial race, which by then was in full swing, a *Baltimore Sun* writer referred to members of the Ehrlich Administration as "those people who introduced us to the Prince of Darkness [as Steffen acknowledged was his nickname] and the Avenging Ice Dancer," obviously Maddalone. Doug Donovan, *Aides cast best light on O'Malley shuffle; Maryland Votes 2006*, BALTIMORE SUN, May 23, 2006, at 1B. In early June 2006, the Special Committee followed through, and by Delegate Jones filed suit in the Circuit Court for Baltimore County to compel Maddalone to answer the unanswered questions, a development that itself garnered significant press coverage.[8]

---

8. Witness Craig B. Chesek also appeared before the Special Committee and refused to answer a number of questions. He too was named a defendant in the lawsuit. With respect to Maddalone, the circuit court granted summary judgment in favor of Delegate Jones on the state employee database question and in favor of Maddalone on the payment of attorneys' fees question. It granted summary judgment against Chesek in full, ruling that he had to answer all questions posed to him.

In the agency hearing, Maddalone introduced evidence that, during Mayor O'Malley's gubernatorial campaign, his website contained an entry criticizing Governor Ehrlich's distribution of homeland security funds and commenting, plainly in reference to Maddalone, that the Ehrlich Administration had

valued political patronage over qualifications. The Ehrlich administration hired a campaign friend and former ice dancer for a senior position in the Port of Baltimore even though the person had no relevant experience.

To further demonstrate the political climate at that time, Maddalone moved into evidence a page from Mayor O'Malley's campaign sponsored website that, under the caption, "You can judge a man by the company he keeps," showed a photograph of Maddalone's head, and the heads of other men, surrounding a photograph of Governor Ehrlich's head. In an accompanying blurb, the website offered the following assessment of Maddalone:

Maddalone had no work experience or higher education outside of professional ice dancing before helping out with Ehrlich's 2002 campaign. Once Ehrlich was in office, Maddalone was placed in the transit administration as an "axeman" who draped a shirt reading "you're fired!" over his chair and drew up lists of workers who could be fired. He is now under investigation by a legislative panel [the Special Committee] for his role in the firings. Maddalone claims he "evaluated programs." [9]

Appeals and cross-appeals were filed, and ultimately the Court of Appeals granted *certiorari* prior to any decision by this Court. That Court held that the statute granting the Legislative Policy Committee authority to appoint a special committee "necessarily comes with it the implied power to delegate subpoena power." *Chesek v. Jones,* 406 Md. 446, 450, 959 A.2d 795 (2008). The Court further held that the circuit court erred in ruling that Maddalone did not have to answer the payment of attorneys' fees question.

9. The website, *http://www.martinomalley.com,* no longer contains this page, because the subject matter is no longer timely. A photocopied reproduction of the page is contained in the record.

On October 30, 2006, before there was a ruling in the lawsuit to compel testimony, the Special Committee issued a 133–page Majority Report that among other things found that some dismissals from state employment during the Ehrlich Administration had been made based on political considerations; and recommended that the law applicable to "[p]olitical [t]erminations" be "[c]larif[ied] . . . to make it clear that illegal political terminations include a termination to create a position for a new employee with regard to the new employee's political affiliation, belief, or opinion." MD. GEN. ASSY., SPECIAL COMM. ON STATE EMPLOYEE RIGHTS AND PROTECTIONS, FINAL REPORT, at xii (Oct. 30, 2006). Maddalone was described in the Majority Report as an "operative" of the Ehrlich Administration "who had no apparent qualifications other than that [he was] a political loyalist" and who was "dispatched to top levels of State agencies to identify employees to terminate." *Id.* at 122. The Special Committee members who formed the majority all were Democrats.

Four members of the Special Committee, all Republicans, issued a 39–page Minority Report asserting that 1) the evidence did not show that the Ehrlich Administration "illegally separated State employees [ ]or dispatched employees to departments and agencies for the purpose of identifying State employees for dismissal because of their political affiliation"; 2) the majority (Democratic) legislative leaders were "ignor[ing] the facts and the law for the purpose of preserving its decades-long monopoly, to the detriment of the citizens of Maryland"; and 3) the Special Committee's investigation had been an expensive and fruitless waste of time. SPECIAL COMM. ON STATE EMPLOYEES RIGHTS AND PROTECTIONS, MINORITY REPORT, at 1.

On November 7, 2006, Mayor O'Malley won the gubernatorial election. On December 19, 2006, the *Washington Post* reported that he had selected former Secretary Porcari to be Secretary of the MDOT. In response to the on-line version of the *Washington Post* story, a reader identified only as "donniemcclurkin" posted as follows: "The ice dancer can start packing up his You're Fired T–Shirts. Goodbye Greggie."

In addition to describing and submitting articles about the political climate during his period of state employment, Maddalone testified about his job as emergency response manager and his termination from that job. According to Maddalone, as an emergency response manager, he worked on "various Department emergency response needs," including cleanup and recovery related to Hurricane Isabel; the "National Capital Regions" program; a "management system being implemented by the federal government to handle the Department's beginning stages of bay watch," an early warning system for incidents in Maryland waters; drafting proposals that would streamline communications to various state agencies in the event of an incident; and preparing written policies and procedures for emergency management functions. He first reported directly to John Gowland, who by then was the Deputy Director of OEPES, and then to John Constabile, who took Gowland's position (and eventually became Secretary of Transportation in the Ehrlich Administration).

As an emergency response manager, Maddalone took two classes "offered by the U.S. FEMA Department Incident and Command System" that he was asked, by department heads, to take. He also underwent training sessions in hurricane and flood emergency response.

Maddalone claimed to have had no advance warning that he was going to be fired when he attended the January 23, 2007 meeting with Secretary Porcari and Deputy Secretary Swaim–Staley. Secretary Porcari said the reason for the termination was that "he was looking to make a change in the Department and hire a more professional workforce[.]" Maddalone testified that that remark "[led him] to believe that the reason for [his] termination was because [he] was unprofessional and unqualified for [his] job." He acknowledged that that had been the thrust of the criticism leveled against him in the media and by members of the General Assembly. He opined that, given that he only had met Secretary Porcari "one or two other times," Secretary Porcari "wouldn't have had the ability to make the decision that I was unprofessional or unqualified for my job without having previous knowledge of my—of the

type of person I was and my political affiliation with the prior administration."[10] Maddalone knew of three other people who were terminated the day before he was, including Gowland.

Maddalone recounted that, when he occupied his last state position as emergency response manager, he received two performance evaluations, one dated July 12, 2006, that covered the last six months of 2005, and rated him by numerical assessment as "far exceeds standards," and one dated December 21, 2006, but not finalized until January 3, 2007, that covered the 2006 calendar year, and rated him by numerical assessment as "exceeds standards." These performance evaluations, which were prepared by John Gowland and signed by John Constabile, were moved into evidence.[11]

Maddalone acknowledged before the ALJ that he did not compete for any of the state jobs he held, including the emergency response manager position. He did not file any job applications or take any tests. He was not interviewed and did not submit a résumé. The only training he received was on the job, *i.e.,* attending some seminars as noted above. Maddalone further acknowledged that he is a high school graduate with some credits earned at the Community College of Baltimore County toward an Associate's Degree, and that he is still pursuing that degree. He had no training through formal education in emergency services and no prior experience working for any government transportation authority.

---

**10.** Secretary Porcari later testified that he had never met Maddalone before January 23, 2007. However, as Maddalone acknowledged, any prior contact he had had with Secretary Porcari would have been very brief encounters at large "meet and greet" gatherings and such.

**11.** Maddalone also moved into evidence a CD–ROM of Senate Finance Committee Hearings that took place on January 23, 2007. Supposedly, there were jokes made about him by some people attending those hearings. There was no evidence that Secretary Porcari attended the hearings and the hearings took place after Maddalone was fired. Although the CD–ROM was accepted in evidence, the ALJ properly stated during the hearing that the information on it was irrelevant.

Maddalone claimed that, when working for the MTA, he had implemented but not designed policy.

According to Maddalone, after the 2006 gubernatorial election, he became the subject of a "whisper campaign" in the MDOT predicting that "because of the previous administration and the former governor that I would be looking for a new job shortly after the inaugural swearing-in of the incoming administration." He heard various people in the MDOT say things of that sort. None of them were in his chain of command. He acknowledged that the talk was "all rumor, whisper." In the first 23 days of January 2007, he took off seven personal and vacation days, all approved by his supervisor. He acknowledged that, for most of that month, up until the day he was fired, he was "off the clock."

In its case, the MDOT called as witnesses Secretary Porcari, Deputy Secretary Swaim–Staley, and Judy Slater, Director of Human Resources for the MDOT, and moved several documents into evidence.

Secretary Porcari testified that he discharged Maddalone in a meeting on January 23, 2007, a Tuesday, with Deputy Secretary Swaim–Staley in attendance. He told Maddalone he was terminating him from his job with the Executive Service and provided him a termination letter and standard written information given to separated employees. Secretary Porcari explained that he terminated Maddalone's employment as part of his plan to reorganize the MDOT, especially with regard to homeland security and emergency response duties:

> I was in this position as secretary on September 11, 2001 [during the Glendening administration]. The homeland security function is a very important one for me, I am in the process of both reorganizing it and changing its reporting relationship, it will be reporting directly to me.... [A]fter September 11th, given the vulnerability of the Department, I guess is one indication of how serious this is to me. The person that I hired for the homeland security coordinator position was the retired deputy director of the National

Security Agency and the winner of the [N]ational [I]ntelligence [M]edal.[12]

Secretary Porcari further testified that, in replacing Maddalone, he was looking for "a combination of skills, you typically can't get it all in one person. But direct experience at the federal, State, or perhaps regional or the local level with emergency management, with intelligence-related issues, and joint-operation issues related to homeland security, with—sometimes with law enforcement experience" and other "managerial skills" such as "significant supervisory experience, budget experience, personnel, and procurement." He noted that "one of the things that may be required in the reorganization is to advertise at a higher grade position than we have, and I may need the ability to combine positions to do that."

Secretary Porcari made clear that he decided to terminate Maddalone (and John Gowland) from employment immediately, as part of his planned MDOT reorganization, and he made the termination decision by himself sometime after taking office on Wednesday, January 17, and no later than Friday, January 19, 2007. In that interim, he requested Maddalone's personnel file for review, but was informed that there was no personnel file for him. To Secretary Porcari, "[t]he fact that nothing was there, [wa]s a bit of a red flag." He was not aware of any performance reviews for Maddalone. He testified that, "in the context of a larger discussion about reorganization and work that we have to do here ·at the Department," he told Deputy Secretary Swaim–Staley that he was going to be terminating Maddalone and Gowland.

Secretary Porcari had no contact with the Special Committee or involvement in its investigation. He testified that before he was appointed Secretary of the MDOT he had heard

---

12. At the time, this reference could have been to the National Intelligence Distinguished Service Medal or the National Intelligence Medal of Achievement. (The record is unclear as to which.) *See* Director of Central Intelligence Directive 7/1 (effective Aug. 15, 1993), superseded by Intelligence community Directive No. 655 (effective May 23, 2007), available at http://www.fas.org/irp/offdocs/dcid7–1.htm (last visited Aug. 24, 2009).

the name Gregory Maddalone and he had seen it in the newspaper "on several occasions." He had read some of the reports in the press about Maddalone and thought, "naturally," that "it did raise questions." His focus, however, was on "what we do with homeland security and emergency response." He explained that, as of the time of his testimony (slightly more than three months after he took office), he still was in the process of reorganizing the homeland security and emergency response sections of the MDOT, and had not yet filled the positions vacated by Maddalone and Gowland.

Deputy Secretary Swaim–Staley testified that during the January 23, 2007 termination meeting Maddalone asked if he was being terminated because of the change in administrations. Secretary Porcari responded that the termination was due to reorganization of the MDOT. Deputy Secretary Swaim–Staley understood that the firings happened because Secretary Porcari wanted to put homeland security under his direct supervision, instead of having it remain as part of emergency response services. He was seeking to accomplish that by hiring people with experience in the homeland security area, and understood that it was within "his discretion . . . to hire the people he felt most appropriate to fulfil the mission of homeland security." In their discussion prior to the termination meeting, Secretary Porcari had told her that "it was his discretion as presented by our attorneys and human resources director that we had the authority to hire the people he felt most appropriate to fulfill the mission of homeland security."

Slater was the MDOT's final witness. As Director of Human Resources for the MDOT, she served as the records custodian of personnel files. Slater testified that, right after Secretary Porcari was appointed, someone in his office made a telephone request for Maddalone's personnel file. She retrieved the personnel file and saw it contained only three or four sheets of paper, all of which were standard forms that all state employees must sign to begin work and none of which provided any individualized information about the employee, in this case, Maddalone. The file did not contain a résumé, an

application, or any performance evaluations. It had no documents with information about Maddalone.

At Secretary Porcari's request, Slater's department prepared the termination memorandum to Maddalone that the Secretary signed on January 22, 2007, and gave to Maddalone at the January 23, 2007 meeting.[13]

In addition to the documents already described above, the MDOT moved into evidence organizational charts for the OEPES and the MDOT Secretary's Office, dated February 2007, and a "Position Identification Number ('PIN') History" for two PINs, printed on February 21, 2007. That history showed that the PIN Maddalone held as of June 22, 2005, had been vacant since August 31, 2004, and previously had been held by an Administrative Assistant II, at a salary of $39,752. Maddalone was given that PIN as a re-assignment within the MDOT, and the position was changed to Administrator VI, at a salary of $73,859. A week later, that PIN was transferred from the Maryland Port Authority to the MDOT with the notation "Transfer Position & Incumbent"; the starting salary was increased to $74,967; and a new PIN was substituted for the original number.

The ALJ issued her final written decision on June 11, 2007. She concluded that Maddalone had been terminated unconstitutionally. She reasoned that, because Secretary Porcari did not know anything about Maddalone's qualifications before terminating him from employment, he must have discharged Maddalone for a purely political motive, and only a political motive, based upon the negative press coverage about Maddalone in 2005 and 2006. The ALJ explained, in pertinent part:

> [Secretary Porcari] conceded that he was unaware of [Maddalone's] qualifications, as he never saw [Maddalone's] personnel file, resume, application, or performance appraisals. He also conceded that he was familiar with [Maddalone's]

---

13. Secretary Porcari had planned to terminate Maddalone's employment on January 22, 2007, but Maddalone called in sick that day. For that reason, the termination occurred the next day. The letter of termination remained dated January 22, 2007, however.

name through news accounts and articles, and said that it did raise questions in his mind about [Maddalone]. He insisted, however, that those accounts were not the basis for his decision to terminate [Maddalone]. According to Secretary Porcari, he is looking for a very specific profile for individuals in this Homeland Security department.

\*　　\*　　\*　　\*　　\*　　\*

In this case, the facts are largely undisputed, with the exception of Secretary Porcari's reasoning and motivation in terminating [Maddalone] ... Secretary Porcari admitted that he had heard of [Maddalone] through news accounts and it did raise question[s] in his mind. He conceded that he had never met [Maddalone] previously, and he was unfamiliar with his qualifications for his position with OEPES. Secretary Porcari did not review any of [Maddalone's] personnel information and did not review his performance appraisals. Had he looked at the ... performance appraisals, he would have seen that for the two years that [Maddalone] was an Administrator VI with the OEPES, he received overall ratings of "Far Exceeds Standards" in 2005, and "Exceeds Standards" in 2006.[14]

\*　　\*　　\*　　\*　　\*　　\*

Secretary Porcari testified that he terminated [Maddalone] because he wanted to reorganize the OEPES and bring in more qualified people, perhaps those with federal intelligence and/or Homeland Security experience. *However, he terminated [Maddalone] without having the slightest knowledge of whether [Maddalone's] qualifications could possibly fit the mold of the reorganization he sought.* He made the decision to terminate [Maddalone] two days after he became Acting Secretary. By Secretary Porcari's own admission, the only knowledge that he had of [Maddalone] was news accounts that questioned whether he was commissioned by the Ehrlich Administration to target people in

---

**14.** Maddalone actually was in the position of emergency response manager for 18½ months, not two years.

State agencies for hiring and firing, and questioned his qualifications for any State employment because he is an ice dancer. Secretary Porcari's credibility regarding the ... termination is therefore severely undermined, because he could not possibly have known whether or not [Maddalone] fit within the framework of his reorganization. *Thus, it stands to reason, and I conclude, that [Maddalone] has established that the only knowledge Secretary Porcari had of [him] was through politics and the media, and [Maddalone's] politics were clearly conflicting to Secretary Porcari and that of the new Governor's administration. [Maddalone] was in a mid-level, non-policy making position, and based on the applicable case law, it was unconstitutional for Secretary Porcari to terminate him for that reason. As there could be no other reason for the termination, I must conclude that the termination was unconstitutional, and [Maddalone] was improperly terminated.*

(Emphasis added.)

With that, the ALJ reversed the MDOT's termination of Maddalone's employment and ordered that he be reinstated to his position as Administrator VI, with full back pay and benefits effective January 23, 2007.

On June 25, 2007, the MDOT filed a motion for reconsideration, which Maddalone opposed. The ALJ issued a written decision denying the motion on August 8, 2007. In it, she clarified that, in her June 11, 2007 decision, she had "credited Secretary Porcari's testimony that he was looking for employees with more experience in homeland security, law enforcement and the like[,]" and also had "acknowledged and credited, as Secretary Porcari and Deputy Secretary Swaim–Staley testified, that a discussion occurred about reorganizing the OEPES[.]"[15]

---

**15.** On September 18, 2007, in the Circuit Court for Baltimore County, Maddalone filed a petition for mandamus demanding reinstatement. He did not cooperate, however, with the MDOT as he declined to provide certain documentation necessary for reinstatement. The MDOT reinstated Maddalone and immediately reterminated him on

## STANDARD OF REVIEW

 In an appeal from a circuit court's judicial review of an administrative agency proceeding, we review the final decision of the agency, not the circuit court. *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899 (2007); *Comptroller of the Treasury v. Johns Hopkins Univ.*, 186 Md.App. 169, 181, 973 A.2d 256 (2009). In this case, the OAH had authority to make the final agency decision for the MDOT. COMAR 11.02.08.09A.(3). Thus, it is the ALJ's final decision that is before us for review.

We review final agency decisions under the standards set forth in Md.Code (1984, 2004 Repl.Vol.), section 10–222 of the State Government Article ("SG"). According to that statute, we may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

 (i) is unconstitutional;

 (ii) exceeds the statutory authority or jurisdiction of the final decision maker;

 (iii) results from an unlawful procedure;

 (iv) is affected by any other error of law;

 (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

---

October 23, 2007. Maddalone challenged that termination in the OAH, which upheld the termination. Maddalone did not further challenge the re-termination decision.

The MDOT moved to transfer the mandamus action to the Circuit Court for Anne Arundel County, and that motion was granted on January 11, 2008. According to the MDOT, the mandamus action has been stayed pending this appeal.

(vi) is arbitrary or capricious.

*Id.* at § 10–222(h).[16]

Substantial evidence review, applicable to the ALJ's factual findings, is highly deferential. *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376 (1999). "In applying this test, we ask, after reviewing the evidence in a light most favorable to the administrative agency, 'whether a reasoning mind reasonably could have reached the factual conclusion the agency reached.'" *Colburn v. Dep't of Pub. Safety & Corr. Servs.*, 403 Md. 115, 128, 939 A.2d 716 (2008) (quoting *Banks, supra,* 354 Md. at 68, 729 A.2d 376).

We review the ALJ's legal conclusions *de novo.* *Johns Hopkins, supra,* 186 Md.App. at 181, 973 A.2d 256. Yet, even the agency's legal conclusions are afforded some deference if they concern statutory provisions administered by the agency. *Md. Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145 (2005); *Banks, supra,* 354 Md. at 69, 729 A.2d 376 ("[T]he expertise of the agency in its own field should be respected."); *Johns Hopkins, supra,* 186 Md.App. at 181–82, 973 A.2d 256.

Finally, we may affirm the agency's final decision only on the grounds on which it decided the matter. *Evans v. Burruss,* 401 Md. 586, 593, 933 A.2d 872 (2007) (" '[I]n judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.'") (quoting *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984)); *Dep't of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 111 n. 1, 771 A.2d 1051 (2001) ("We have said time and time again, that we will review an adjudicatory agency decision solely on the grounds relied upon by the agency.") (citing cases); *Frey v.*

---

16. Under SG § 10–222(a)(2), an agency that has delegated a contested case to the OAH for review may seek judicial review of the OAH's final decision to the extent that it is aggrieved and was a party before the OAH.

*Comptroller of the Treasury,* 184 Md.App. 315, 332, 965 A.2d 923 (2009).

## DISCUSSION

### I.

### Did the ALJ err in concluding that Maddalone was unconstitutionally terminated?

Patronage jobs are government positions filled based on partisan politics. They always have been a staple of politics and, though criticized, are not completely lacking in positive purpose, as one federal court of appeals has explained:

> For some, the mention of the phrase "political patronage" may conjure up distasteful and unpleasant thoughts of the party faithful being rewarded for an election victory with the "spoils" of government jobs. Nevertheless, the fact is the effective implementation of public policy sanctioned by the voters (and some say the survival of a viable two-party political system) depends on a newly elected administration placing politically loyal individuals in certain government positions. Of course, following the ouster of the "in party," the initial aspect of the implementation of political patronage typically results in the "creation of vacancies" in the government work force.

*Selch v. Letts,* 5 F.3d 1040, 1041 (7th Cir.1993).

Until 1976, "courts frequently suggested that beneficiaries of patronage should be barred from recovery for patronage firings." *Ecker v. Cohalan,* 542 F.Supp. 896, 902 (E.D.N.Y. 1982) (citing *Nunnery v. Barber,* 503 F.2d 1349, 1359, 1360 (4th Cir.1974), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975); *Illinois State Employees Union Council 34 v. Lewis,* 473 F.2d 561, 573 (7th Cir.1972); *A.F.L. v. Shapp,* 443 Pa. 527, 280 A.2d 375 (1971)). In other words, a person who was hired into government employment in an act of patronage should expect to be discharged upon a change of administration. That understanding changed with the Su-

preme Court's decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

In *Elrod*, a plurality of the Court held that dismissal of a public employee solely on the ground of partisan political affiliation violates the employee's right to free speech under the First Amendment, unless the employee holds a "policy-making" or "confidential" post. 427 U.S. at 367, 96 S.Ct. 2673 (plurality opinion of Brennan, J.); *id.* at 375, 96 S.Ct. 2673 (Stewart, J., concurring). Four years later, in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court refined its *Elrod* holding. Noting that not every policymaking or confidential position is political and not every political position is policymaking or confidential, the Court explained: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. 1287.

■ That inquiry, now commonly called the *"Elrod–Branti"* test, is implicated when an employee is "discharged allegedly for political patronage reasons." *Newell v. Runnels*, 407 Md. 578, 610, 967 A.2d 729 (2009). *See also O'Leary v. Shipley*, 313 Md. 189, 204, 545 A.2d 17 (1988). The *ElrodBranti* test " 'is a narrow and somewhat rigid one ... and is aptly applied only to a set of facts that, as a threshold matter, show political patronage as the *sole motive* of discharge.' " *Newell, supra,* at 614, 967 A.2d 729 (quoting *O'Leary, supra,* at 205, 545 A.2d 17) (emphasis in *Newell* ).

■ A different, less stringent test applies to political terminations of public employees for "overt expressive conduct," such as speaking out against an employer in the course of an election. *O'Leary, supra,* at 205–06, 545 A.2d 17. Under the so-called *"Pickering"* balancing test, derived from the holding in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as supplemented by the holding in *Mt. Healthy City School District Board of Education v.*

*Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the terminated employee bears the burden to prove that he engaged in speech or overt activity protected by the First Amendment and that his speech or overt conduct was a factor substantially contributing to the termination decision. If the terminated employee satisfies this burden, the government employer can avoid liability by showing, by a preponderance of the evidence, that "it would have reached the same [employment termination] decision absent the constitutionally-protected conduct." *Newell, supra,* 407 Md. at 612, 967 A.2d 729 (citing *Mt. Healthy, supra,* at 287, 97 S.Ct. 568).

 The case at bar was an alleged "[r]aw patronage discharge[ ] of the *Elrod–Branti* type." *Jones v. Dodson,* 727 F.2d 1329, 1335 (4th Cir.1984). The parties and the ALJ all recognized that the *Elrod–Branti* test controlled. Again, under that test, it was Maddalone's burden to prove by a preponderance of the evidence that he was terminated from his government job *solely* because of his political affiliation and that his job was not one for which "party affiliation [was] an appropriate requirement for ... effective performance[.]" *Branti,* 445 U.S. at 518, 100 S.Ct. 1287. Thus, the ALJ was charged with making a (potentially) two-pronged decision: 1) whether Maddalone in fact was terminated from his position solely for his political beliefs; and 2) if so, whether his position was of a nature that political beliefs were properly required for effective performance.

 The MDOT advances several arguments in support of its contention that the ALJ erred in ruling that Maddalone was fired unconstitutionally. Some concern the first prong of the *Elrod–Branti* test, that is, why was Maddalone terminated, and some concern the potential second prong of that test, *i.e.,* whether, if he was terminated solely based on his political affiliation, he occupied a position for which political dismissal was appropriate. Its primary argument on the first prong of the *Elrod–Branti* test is that the ALJ's factual findings were not supported by substantial evidence in the record and were

not reasonable findings that a reasoning mind could reach. We agree.

The narrow *Elrod–Branti* test is also known as the "sole motive" test because it carries a strict causation requirement. In an *Elrod–Branti*-type claim, the employee challenging dismissal from public employment on constitutional grounds must show that he was discharged *solely* based upon his political affiliation. If the employee proves that he was discharged for his political affiliation *and* for another reason that is not unconstitutional, he has not satisfied the *Elrod–Branti* test, and the termination was not unconstitutional. If it were otherwise, the employee's political affiliation would immunize him from being discharged for a perfectly legitimate reason.

In the context of analyzing the *Pickering* balancing test, in which an unconstitutional failure to hire was alleged, the Supreme Court explained why it is essential that causation be proven in unconstitutional political dismissal claims:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire [or to terminate], could place the employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. [Such a rule] would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected

conduct makes the employer more certain of the correctness of its decision.

*Mt. Healthy, supra,* 429 U.S. at 285–86, 97 S.Ct. 568.

In the case at bar, the ALJ made the following pertinent first-level factual findings relating to the issue of "sole motive" for dismissal. She found that, when the termination was decided and carried out:

- Secretary Porcari knew about Maddalone only from media coverage and only as a political figure associated with the Ehrlich Administration.
- Secretary Porcari did not have any information about Maddalone's job performance as an emergency response manager.
- Secretary Porcari did not have any individualized personnel information about Maddalone, such as a résumé, educational background, or prior experience.
- Secretary Porcari intended to reorganize the homeland security and emergency services sections of the OEPES in part by upgrading the qualifications for existing positions, such as Maddalone's, so that employees would have federal experience in homeland security, and possibly experience in intelligence or law enforcement; and he had discussed his intention with Deputy Secretary Swaim–Staley.

From those findings, the ALJ deduced that Secretary Porcari *could not have known* when he fired Maddalone whether Maddalone possessed the qualifications he was seeking in employees holding positions in homeland security/emergency services; therefore, any lack of qualifications on Maddalone's part, not being known to Secretary Porcari, *could not have been* a basis for terminating his employment. And, Secretary Porcari *only* could have fired Maddalone based on the media reports depicting him as a political ally of Governor Ehrlich, so Maddalone's political beliefs *must have been* Secretary Porcari's sole motivation for firing him.

Some of the first-level findings listed above are not supported by evidence in the agency record; and those that are do not reasonably compel the conclusion that Secretary Por-

cari fired Maddalone *solely* for his political affiliation and not for 1) another reason that was constitutional; *or* 2) another reason that was constitutional *and* based upon his political affiliation.

The evidence in the agency record does not support a reasonable finding that what Secretary Porcari knew about Maddalone on January 23, 2007, was limited to Maddalone's political associations and beliefs and did not include his lack of qualifications for the positions he held during the Ehrlich Administration, and, in particular, for the job of emergency response manager. All of the evidence, including Maddalone's own testimony, showed that when the media criticized him for his political activity it also criticized him for not being qualified for the jobs he held.[17] Indeed, it was Maddalone's lack of qualifications that prompted members of the press to refer to him by his former profession, as an ice skater. The press did not dub Maddalone "the ice dancer" because there is anything intrinsically the matter with being an ice dancer but because, as all the news coverage said, he was not qualified by education or experience in any activity related to his MDOT job duties and the field he was qualified in—ice dancing—was entirely different and not integral or even relevant to his state jobs. It was that contrast that gave the "ice dancer" nickname meaning.

Maddalone was the proponent of the documentary evidence of intense negative press coverage criticizing him for using his state jobs as a vehicle to identify state employees for firing on the basis of their politics *and* for being unqualified for the very jobs he held while doing so. Maddalone testified, in effect, that the press used the "ice dancer" moniker as a shorthand reminder to readers that he was not qualified for any of the state jobs he held.

---

17. Maddalone testified about the articles he moved into evidence that "basically the assessment of these articles from May of 2005 until today" was that he "was a professional performer, professional ice [dancer], who is not qualified to do his job." He also stated that the articles reported that he "was a professional ice dancer who had no qualifications."

Secretary Porcari's entire testimony about Maddalone was that he had heard of his name "on several occasions" by virtue of newspaper reports, that he had read some of the press coverage about Maddalone, and that he had thought, "naturally," that "it did raise questions." The exchange on that last point, on cross-examination, was as follows:

Q. You had formed no impression of Mr. Maddalone based on what you read about him in the press?

A. I—I certainly read about that. I'm not sure I saw all of it, but it—it—it—it did raise questions. In other words, I think it was natural. I think that—but the imperative, from my perspective, is what we do with homeland security and emergency response.

Nothing in Secretary Porcari's "it did raise questions" answer suggested that "the questions" raised in his mind by the newspaper coverage only concerned Maddalone's political ties and did not concern his lack of job qualifications. Moreover, as the two points were related and reported in tandem, it is unreasonable to think that Secretary Porcari's answer was about one and not about the other. To the extent the ALJ relied upon the negative press reports about Maddalone to make her finding about Secretary Porcari's motive for discharging him, neither that evidence nor any additional evidence (such as Maddalone's own testimony) could support a reasonable finding that the Secretary based his termination decision solely upon Maddalone's political affiliation and not also upon the fact that he was not qualified by education or experience for the position he held, and for that position as the Secretary envisioned under a reorganized MDOT.

In her decision on reconsideration, the ALJ, drawing upon that unreasonable distinction, stated that, if the MDOT had wished to elicit from Secretary Porcari that he understood that Maddalone was unqualified for his job as emergency response manager, the burden was on it to do so by posing particular questions on that point. This plainly was a misapplication of the burden of proof in a case governed by the *Elrod–Branti* test. If Secretary Porcari's "it did raise ques-

tions" remark showed that he had a negative view of Maddalone, it showed that that negative view was about the essential focus of the "ice dancer" media coverage: that Maddalone was a political ally of Governor Ehrlich who, for that reason, had benefited from government jobs he did not qualify for, including the one he held when he was discharged. And, if that evidence reflected why Maddalone was terminated (which the ALJ thought it did), it did not show that Maddalone was discharged *solely* due to his political affiliation. Rather, at best for Maddalone's case, it showed that he was discharged because of his political affiliation *and* for want of appropriate job qualifications. As the absence of appropriate job qualifications is a permissible constitutional basis for termination, Maddalone's evidence did not satisfy the *Elrod–Branti* test.

We doubt it was possible to further parse Secretary Porcari's testimony to somehow show that the news articles "raised questions" in his mind about Maddalone's political associations but not about his job qualifications. If it were possible, however, the burden was on Maddalone to show that in his own case, which he did not do. None of the evidence elicited on crossexamination (or any examination) of Secretary Porcari reasonably could be understood to satisfy the *Elrod–Branti* sole motive test.

Because, contrary to the ALJ's finding, Secretary Porcari's "questions" about Maddalone arose from the media coverage that was not confined to his political ties but concerned, as well, the intertwined reported fact that he was not qualified for his jobs, the ALJ's further finding, that the Secretary knew absolutely nothing about Maddalone's qualifications either for the position he held or for the upgraded position the Secretary was seeking to fashion, is clearly wrong. By knowing through the media accounts that Maddalone was a high school graduate with no other training, whose only past work experience was in ice dancing, Secretary Porcari also would have known that Maddalone was not qualified, by education or experience, for the position of emergency response manager and most certainly not for the job he intended to upgrade that position to.

The ALJ's incorrect finding that Secretary Porcari knew nothing about Maddalone's qualifications when he fired him was the foundation of her further finding that Secretary Porcari only could have fired Maddalone based upon his political affiliation and could not have fired him for his lack of qualification for the then or future emergency response manager position. As noted above, putting aside the ALJ's findings that were not supported by substantial evidence, at best for Maddalone the hearing evidence showed that Secretary Porcari's decision to fire him was based on his political affiliation *and* his lack of qualifications. Discharging Maddalone for not being qualified was a permissible, not unconstitutional, act. Accordingly, there was not substantial evidence in the agency record to support the ALJ's ultimate finding that political affiliation was Secretary Porcari's sole motive for discharging Maddalone.

We hasten to point out that the ALJ's incorrect factual findings were not the products of demeanor-based credibility assessments of Secretary Porcari, to which we would owe significant deference. *See, e.g., Bereano v. State Ethics Comm'n,* 403 Md. 716, 746, 944 A.2d 538 (2008); *Schwartz v. Md. Dep't of Natural Res.,* 385 Md. 534, 554, 870 A.2d 168 (2005). The ALJ expressly credited Secretary Porcari's testimony that he intended to reorganize the homeland security and emergency services sectors of the MDOT by, among other things, upgrading the qualifications needed to work in that area, and that he and Deputy Secretary Swaim–Staley had discussed that plan before the termination took place. She also credited Secretary Porcari's testimony that he asked for Maddalone's personnel file before the termination, but was told that there was none. She rejected the Secretary's testimony that he discharged Maddalone as part of his reorganization of homeland security and emergency services not as a demeanor-based credibility assessment, but by reasoning, based upon a faulty factual finding, that that simply could not have happened. She concluded that, "[a]s there could be no other reason for the termination, I must conclude that the

termination was unconstitutional[.]" That conclusion was not supported by substantial evidence in the agency record, for the reasons we have explained.

The ALJ's findings about Maddalone's performance evaluations, and about Secretary Porcari's not receiving them, or not doing enough to obtain them, and her findings about Maddalone's personnel file do not lend evidentiary substance to her conclusion that the termination was unconstitutional. The evidence respecting Maddalone's personnel file was Secretary Porcari's assertion that none was found and Slater's testimony that a file was found but only contained a few pages of standard forms and no information personal to Maddalone. Whichever was the case, the evidence established that there was no personnel file for Maddalone that contained any meaningful information about his education, training, job history and experience, or general background. And Maddalone himself testified that he had never submitted an application or a résumé for any of the state positions he held, including the position of emergency response manager.

Accordingly, there was nothing in the evidence to show that any additional effort or time that Secretary Porcari (or anyone else) could have taken to obtain Maddalone's personnel file would have uncovered positive information about his job qualifications; or that Secretary Porcari would have learned anything positive about Maddalone's education, training, job history or experience, or general background had he questioned Maddalone or anyone else about those topics. Indeed, the evidence was clear that there was no such positive information to be learned. In that circumstance, any conclusion that it was unconstitutional for Secretary Porcari to terminate Maddalone on January 23, 2007, in part because he did not see Maddalone's personnel file or obtain information from other sources about his background, is completely undercut by the evidence that, if he had seen what passed for Maddalone's personnel file or had communicated with others about his job qualifications, he only would have learned that Maddalone indeed was not qualified either for the job he held or the job the Secretary intended to elevate that position to.

Likewise, it was of no moment, in any way, that Secretary Porcari fired Maddalone without first seeing his performance evaluations for the 18½ month period in which he held the position of emergency response manager. No matter how complimentary the evaluations were of Maddalone's work, they did not disclose any qualifications he had for that job as it then existed or as Secretary Porcari intended to make it.

 As we explained in setting forth the standard of review, upon judicial review of the final decision of an administrative agency, we only may affirm the agency's decision on the reasons given by the agency. In this case, the ALJ's reasons for concluding that Maddalone was discharged *solely* based upon his political affiliation were not supported by the record evidence and are not such that a reasoning mind could reach. For this reason alone, the ALJ erred in ruling that, under the *Elrod–Branti* test, Maddalone's termination was a First Amendment violation.[18]

## II.

### Did the ALJ err in awarding Maddalone reinstatement and back-pay, when he was not ready and willing to return to work?

As noted above, because we have reversed the ALJ's decision in favor of Maddalone, the second question presented is moot.

---

**18.** Because the ALJ's "sole motive" finding is not supported by substantial evidence, we need not address the MDOT's argument that the ALJ also incorrectly found that Maddalone's position was such that political affiliation was an appropriate reason for discharge.

Also, the MDOT devotes a significant part of its brief to advancing the legal argument that Maddalone held a "special appointment" in the Executive Service, and therefore could be fired for any reason, including an unconstitutional or illegal reason. This argument was not raised before the ALJ (or the circuit court on judicial review), and therefore is not properly before this Court. Md. Rule 8–131; *Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 207–08, 725 A.2d 1027 (1999); *Lee–Bloem v. State*, 183 Md.App. 376, 383, 961 A.2d 647 (2008). We note also that there is no evidence in the agency record that Maddalone ever was hired as a "special appointment."

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY TO REMAND FURTHER TO THE OAH TO AFFIRM THE MDOT'S JANUARY 23, 2007 DISCHARGE OF GREGORY J. MADDALONE FROM EMPLOYMENT. COSTS TO BE PAID BY THE APPELLEE.