REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1477

September Term, 2013

---

MARYLAND COMMISSIONER OF
FINANCIAL REGULATION

v.

CASHCALL, INC., ET AL.

---

Krauser, C.J.,
Kehoe,
Rodowsky, Lawrence F.
  (Retired, Specially Assigned),


JJ.

---

Opinion by Krauser, C.J.

---

Filed:  October 27, 2015

This appeal requires that we delve into the question of what constitutes a "credit services business" under the Maryland Credit Services Business Act ("MCSBA").[1] This issue arose when, prompted by consumer complaints, the Maryland Commissioner of Financial Regulation,[2] appellant, conducted an investigation into the business activities of CashCall, Inc., a California corporation, and its president and sole share-holder, John Paul Reddam, appellees. The Commissioner found that CashCall had arranged, from 2006 to 2010, more than 5,000 loans for Maryland consumers, loans which were issued by two federally insured out-of-state banks, at interest rates significantly greater than the rates permitted by Maryland law. Then, three days after the issuance of each and every loan, CashCall, pursuant to an agreement it had with each of the two out-of-state banks, promptly purchased the loan from the issuing bank and thereafter collected all payments, interest, and fees due on that loan from the borrowing Maryland consumer. Concluding that CashCall and Reddam had engaged in the "credit services business" without a license to do so and without complying with any of Maryland's remedial statutes governing such enterprises, the Commissioner ordered appellees to cease and desist from such activities and imposed upon them a civil penalty for each of the more than 5,000 loans they had arranged for interested Maryland consumers.

---

[1] Md. Code (1975, 2013 Repl. Vol.) §§ 14-1901–1916 of the Commercial Law Article ("Com. Law").

[2] The Commissioner's statutory title is "the Commissioner of Financial Regulation of the Department of Labor, Licensing, and Regulation." Md. Code (1980, 2011 Repl. Vol.) § 1-101(g) of the Financial Institutions Article ("Fin. Inst."); Com. Law § 14-1901(b).

1

Vigorously disagreeing with the Commissioner's assessment of its business activities in Maryland, CashCall petitioned the Circuit Court for Baltimore City for judicial review. Before that court, as it did before the Commissioner, CashCall insisted that, at no time, during its marketing, facilitation, and ultimate acquisition of the loans it arranged, was it acting as a "credit services business," as defined by the MCSBA, because it never received any compensation "directly" from a Maryland consumer for its services and, therefore, under extant Maryland caselaw, did not qualify as such a business. The Baltimore City circuit court agreed and reversed the Commissioner's order, prompting the Commissioner to note this appeal.

Because we believe that the Commissioner was correct in concluding that CashCall was a "credit services business," under the MCSBA, we shall reverse the decision of the circuit court and remand for that court to affirm the Commissioner's decision in this matter.

**I.**

CashCall, a California corporation, and its president and sole share-holder, John Paul Reddam, were engaged in the business of marketing small loans, through a range of media outlets, to Maryland consumers. The loans were to be issued, at interest rates significantly greater than those permitted by Maryland law, by two federally insured out-of-state banks: First Bank & Trust, a South Dakota-chartered state bank; and First Bank of Delaware, a chartered bank of that state. Three types of loans were offered by CashCall to interested Marylanders: a loan of $5,025 at an annual interest rate of 59%; a loan of $2,600 at an annual interest rate of 96%; and a loan of $1,025 at an annual interest rate of 89%.

2

From January of 2006 through the end of 2010, CashCall arranged 5,651 such loans for Maryland consumers.

CashCall's advertisements directed interested Maryland consumers to its website where they could obtain a loan application and instructions on how to complete that form. They also provided a telephone number that consumers could call to obtain assistance in filling out the website's loan application. And, once a loan application was completed by an interested Maryland consumer, CashCall would forward that application to one of the two federally insured out-of-state banks for approval.

Once the application was approved by one of the two banks, that bank would disburse the loan to the consumer, though subtracted from the amount of the loan was an "origination fee," that is, "a fee charged by a lender for preparing and processing a loan."[3] Illustratively, for an approved loan of $2,600, the Maryland consumer received only $2,525 from the bank, that is, the loan amount less a $75 origination fee. The consumer was then to pay the bank, or whomever thereafter held the loan, $2,600, the origination fee having been rolled into the loan amount, plus interest. Thus, the consumer ultimately paid the origination fee as he or she repaid the loan in monthly installments to whomever held the loan.

After the loan was made, CashCall, under the contract it had entered into with each of the two out-of-state banks, would promptly purchase the loan from the issuing bank. Although its initial contracts with the two banks required CashCall to purchase the loan

_____

[3] *Black's Law Dictionary* 732 (10th ed. 2014).

3

"on the same business day" that the loan was issued, those agreements were later amended to grant CashCall three days to purchase the loan after it was disbursed to the consumer. The purchase price for each loan, as noted, was the amount of the loan actually received by the consumer plus the origination fee. Thus, for the $2,600 consumer loan described earlier, CashCall would purchase the loan from the bank for $2,600—that figure comprised the $2,525 actually loaned to the consumer plus the $75 "origination fee" to be paid by the consumer.[4] The banks, in turn, paid CashCall a "royalty fee" of between $5.00 and $72.22 per loan, depending on the amount of the loan and which of the two out-of-state banks had made the loan.

Upon purchasing a loan, CashCall acquired the right to enforce the loan's terms and to collect the payments that were to be made by the borrowing consumer under the terms of the loan, including all interest, penalties, and fees. Indeed, if a consumer mistakenly sent a loan payment to the bank, rather than to CashCall, after CashCall had purchased the loan, the bank was, pursuant to its contract with CashCall, obligated to "promptly" forward that payment to CashCall.

Thus a Maryland consumer, who used CashCall to obtain such a loan, never paid any loan payments or, for that matter, any fees or other payments of any nature, to the out-of-state bank that initially issued the loan, but, instead, made all such payments directly to CashCall. That meant, in making loan payments to CashCall, the consumer paid

---

[4] CashCall would also pay, to the banks, the interest that had accrued on the loan during the three-day period between the disbursement of the loan and its subsequent purchase by CashCall.

4

CashCall the origination fee, which had been "rolled into" the amount of the loan, a fact that will play a role in our pending analysis of whether CashCall was a "credit services business."

## II.

From 2007 to 2009, the Commissioner received complaints from fourteen Maryland consumers "concerning high-interest loans which [CashCall] arranged for them" and its "collection activities" with respect to those loans. At the hearing that was held before an administrative law judge ("ALJ") on this matter, testimony was provided that showed that the consumers, who contacted CashCall seeking a loan, were often responding to difficult and pressing situations, such as loss of employment or the death of a family member. Moreover, in the words of the ALJ who presided over that hearing, the "borrowers who availed themselves of CashCall's services" were "pushed to borrow more than they wanted" by CashCall, encountered "serious difficulty in determining a payoff amount" when they sought to pay off their loans early, and were "unable to extricate themselves from the burden of the debts they had incurred."

On June 23, 2009, after investigating CashCall's business activities, the Commissioner issued a summary order[5] directing CashCall to, among other things, "cease

---

[5] Section 2-115(a) of the Financial Institutions Article grants the Commissioner the discretion to issue "a summary order" directing a person who has "engaged in an act or practice constituting a violation of a law, regulation, rule or order over which the Commissioner has jurisdiction" to "cease and desist" from engaging in that activity. The summary cease and desist order must give the person notice of the opportunity for a hearing before the Commissioner and notice that the summary order will be "entered as final" if a hearing is not requested within fifteen days. *Id.* If such a hearing is requested and (cont.)

and desist" from engaging in its current business activities in Maryland, which, in the Commissioner's view, amounted to the unlicensed provision of "credit services." In response to that preliminary order, CashCall requested a hearing in the Office of Administrative Hearings. After that request was granted, the aforementioned hearing was held before an ALJ. And, following that hearing, the ALJ issued, on December 3, 2010, a "proposed decision," recommending that the Commissioner find that CashCall had violated the MCSBA and the Maryland Consumer Loan Law by engaging in the credit services business without a license to do so, that the Commissioner issue a final cease and desist order prohibiting CashCall from operating a "credit services business" in Maryland, and that CashCall be directed to pay a civil penalty for each of the 5,651 loans it had assisted consumers in obtaining. Then, generously treating each of the 5,651 loans as a "first offense," rather than as a "second" or "subsequent offense," the ALJ suggested that CashCall be ordered to pay a penalty of $1,000 per loan[6] for a total civil penalty of $5,651,000. On January 3, 2011, the Commissioner issued a "proposed order" adopting those recommendations.

---

(cont.) held and the Commissioner determines that a violation was committed, the Commissioner may "issue a final cease and desist order against the person," "suspend or revoke the license of the person," "issue a penalty order against the person imposing a civil penalty up to the maximum amount of $1,000 for a first violation and a maximum amount of $5,000 for each subsequent violation, or "take any combination" of those actions, as well as "any other action authorized by law." Fin. Inst. § 2-115(b).

[6] Had the ALJ determined that each loan after the first was a "subsequent violation," a penalty of up to $5,000 for each subsequent loan could have been imposed. Fin. Inst. § 2-115(b).

CashCall thereafter filed exceptions to the Commissioner's "proposed order." The hearing on those exceptions, however, was subsequently stayed, at CashCall's request, pending the Court of Appeals' decision in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128 (2012). When that decision was issued, the stay was lifted and a hearing was held before the Commissioner on November 8, 2012. Upon the conclusion of that hearing, the Commissioner issued a "final order," requiring both CashCall and Reddam to cease and desist from engaging in "credit services business" activities in Maryland, and he imposed a civil penalty of $5,651,000, for which appellees were jointly and severally liable. On December 7, 2012, CashCall—but not Reddam—filed a petition for judicial review and a motion to stay enforcement of the Commissioner's order in the Baltimore City circuit court.

Four months later, on April 11, 2013, CashCall and Reddam filed an amended petition for judicial review, adding Reddam as a petitioner. The circuit court, however, dismissed their joint petition as "untimely." That ruling, in effect, eliminated Reddam as a party to the judicial-review proceeding.

After observing that CashCall "may very well" be a "predatory entity preying on" Maryland consumers that has "developed a scheme to evade the usury laws of Maryland," the circuit court nonetheless reversed the Commissioner's final order, declaring that, under the Court of Appeals' decision in *Gomez*, CashCall was not a "credit services business," under the MCSBA and therefore was not required to comply with the terms of that act. A supplemental order was thereafter issued by that court to make it clear that its reversal of the Commissioner's final order pertained only to CashCall and not Reddam, as Reddam was not a party to the original and only extant petition for judicial review.

7

The Commissioner then noted an appeal from that decision, which was followed by a cross-appeal filed by CashCall and Reddam, challenging the court's dismissal of their amended petition for judicial review and the scope of its order reversing the Commissioner's decision. That cross-appeal, however, does not merit further discussion as the issues it raises are rendered moot by our holding that CashCall did, in fact, violate the MCSBA.[7]

### III.

It is undisputed that CashCall was assisting Maryland consumers to obtain loans from the two federally insured out-of-state banks. The Commissioner therefore contends that he was correct in determining that CashCall was operating as an unlicensed "credit services business" in Maryland in violation of the MCSBA. CashCall, of course, claims otherwise. It maintains, and the circuit court agreed, that, under the Court of Appeals' then recent decision in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128 (2012), which considered

---

[7] Appellees raise two issues in their cross-appeal. First, they contend that the circuit court erred in granting the Commissioner's motion to dismiss their amended petition for judicial review on the grounds that the amended petition was "untimely." Specifically, they claim that their amended petition "related back" to the original petition filed by CashCall, as their amended petition did not "add new claims or arguments" to the original petition but sought only to add Reddam as a party to the proceedings. Since we reject CashCall's claims, this issue is now moot.

Second, appellees claim that the circuit court erred in entering an order that reversed the Commissioner's final order as to CashCall but not Reddam, leaving him liable for the civil penalty imposed by the Commissioner. Reddam's liability was "derivative" of CashCall's, they assert, and thus, in the event that CashCall was found not to have violated the MCSBA, Reddam could not be held individually liable for the penalty imposed by the Commissioner. But, as we conclude that CashCall violated the MCSBA, this issue is also moot.

the MCSBA's definition of a "credit services business," CashCall was not a credit services business because it did not receive "direct payment" from consumers for its services, a requirement CashCall asserts is, under *Gomez*, a prerequisite for the MCSBA to apply.

"In an appeal from a circuit court's judicial review of an administrative agency proceeding, we review the final decision of the agency, not the circuit court." *Md. Dept. of Transp. v. Maddalone*, 187 Md. App. 549, 571 (2009). And that review is generally "a narrow and highly deferential inquiry." *Md.–Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n.*, 412 Md. 73, 83 (2009). Indeed, our review is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Service, Inc. v. People's Counsel for Balt. Cnty.*, 336 Md. 569, 577 (1994). In making that determination, the test we apply is "whether a reasoning mind could reasonably have reached the conclusion reached by the agency, consistent with a proper application of the controlling legal principles." *HNS Dev., LLC v. People's Counsel for Balt. Cnty.*, 200 Md. App. 1, 14 (2011) (quotations and alterations omitted).

Moreover, in reviewing an agency's conclusions of law, we afford "considerable weight" to the "agency's application of the statutory and regulatory provisions that are regularly administered by the agency," *Md. Bd. of Physicians v. Elliot*, 170 Md. App. 369, 408 (2006), though an agency's construction of a statute "is not entitled to deference . . . when it conflicts with the unambiguous statutory language," *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 170 n.35 (2012) (internal citation omitted). In other words, it is "always

9

within our prerogative to determine whether an agency's conclusions of law are correct."

*Crofton Convalescent Ctr. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 215 (2010) (internal quotation marks and citations omitted).

The MCSBA, in conjunction with the Maryland Consumer Loan Law,[8] grants the Commissioner broad licensing, investigatory, and enforcement authority over what the MCSBA deems to be a "credit services business," a business that is defined by the MCSBA as one in which a

> person[9] who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services ***in return for the payment of money or other valuable consideration***: . . . (ii) Obtaining an extension of credit for a consumer; or (iii) Providing advice or assistance to a consumer with regard to [obtaining an extension of credit for a consumer].

Com. Law § 14-1901(e)(1) (emphasis added).

The act defines an "extension of credit" as "the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes," Com. Law § 14-1901(f), and a "consumer" as "any individual who is solicited to purchase or who purchases for personal, family, or household purposes the services of a credit services business," Com. Law § 14-1901(c).

The MCSBA requires a "credit services business" to, among other things, secure a license from the Commissioner, Com. Law § 14-1903(b); maintain a surety bond, Com.

---

[8] The Maryland Consumer Loan Law is codified in Fin. Inst. §§ 11-201–223 and Com. Law §§ 12-301–317.

[9] The definition of a "person" includes a corporation, like CashCall, and an individual, like Reddam. Com. Law § 14-1901(g).

10

Law §§ 14-1908–1909; and provide an interested Maryland consumer with a written information statement, Com. Law §§ 14-1904–1905, which describes the duties and obligations of the credit services business (such as the obligation to provide a complete and detailed description of the services to be performed by the credit services business and the total amount the consumer will have to pay for those services) and the rights of the Maryland consumer (such as the right to file a complaint with the Commissioner against a credit services business). It further requires that any contract such a business enters into with a consumer include a statement that the consumer has the right to "cancel th[e] contract at any time prior to midnight of the third business day after the date of the transaction." Com. Law § 14-1906.

In assisting a Maryland consumer in obtaining a loan, however, the credit services business may not help a consumer secure a loan with an interest rate that exceeds the maximum interest rates permitted by Maryland law. Under Maryland law, the maximum annual interest rate for a loan of $2,000 or less is 33%, and for a loan greater than $2,000, 24%. Com. Law § 12-306(a)(6). But—of particular relevance to CashCall's business practices—Maryland limits on interest rates for consumer loans do not apply to federally insured out-of-state banks, and "a federally insured depository institution, whether federal or state-chartered, may charge the interest rate permitted in its home state to borrowers across state lines, regardless of the legal rate in the borrower's state." *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 163 (2012) (internal quotation marks and citation omitted).

But, though federal law permits federally insured out-of-state banks to charge what would otherwise be usurious rates of interest on loans issued to Maryland consumers, the

MCSBA prohibits a "credit services business" from "assist[ing] a consumer to obtain an extension of credit at a rate of interest which, except for federal preemption of State law, would be prohibited" under state law. Com. Law § 14-1902(9). That is to say, a credit services business may not, under the MCSBA, assist a consumer in obtaining a loan, from any in-state or out-of-state bank, at an interest rate prohibited by Maryland law.

**IV.**

As to whether CashCall was a "credit services business" under the MCSBA's definition of that term, both CashCall and the Commissioner direct us to the Court of Appeals' decision in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128 (2012). In *Gomez*, Maryland's highest court was asked to decide whether a "tax preparer" was acting as a "credit services business" when, in the course of preparing tax returns for its clients, it also assisted those clients in obtaining a "refund anticipation loan," acronymically known as a "RAL." To provide that service, the tax preparer in *Gomez*, Jackson Hewitt, had entered into an agreement with a lender, Santa Barbara Bank & Trust ("SBBT"), pursuant to which SBBT would "offer, process and administer," to Jackson Hewitt customers, a RAL, specifically, a "high interest loan . . . secured by the consumer's expected income tax refund," which enables "the consumer to receive a tax refund roughly ten days sooner than the IRS would deliver it." *Id*. at 133–34 & n.4. To promote and facilitate such loans, Jackson Hewitt would customarily inform its clients of the availability of these RALs and assist interested clients in filling out applications for those loans. *Id.* at 134–36. Upon approving a loan, SBBT paid a "fixed annual fee as well as variable payments tied to

12

growth in the [RAL] Program" to Jackson Hewitt for the "performance of services" rendered by Jackson Hewitt "on behalf of SBBT." *Id.* at 134.

After preparing the federal income tax return of Alicia Gomez, Jackson Hewitt helped her obtain a RAL in accordance with its arrangement with SBBT. *Id.* at 134. The loan Gomez received from SBBT had an 85.089% annual interest rate for a total loan amount of $2,323. *Id.* at 136. But the bank did not disburse the total amount of the loan to Gomez. *Id.* It paid to her just $1,950.97 of the $2,323 loan, retaining $88.03 as fees and paying $284 of the loan amount to Jackson Hewitt, the "tax preparation fee," which Gomez owed Jackson Hewitt. *Id.*

Gomez subsequently brought suit against Jackson Hewitt, contending that Jackson Hewitt was a "credit services business," that it was therefore subject to the MCSBA, and that it had violated the MCSBA by arranging her RAL without complying with the duties and obligations imposed by that act on such businesses. *Id.* at 137–38. When Jackson Hewitt moved to dismiss the complaint on the grounds that Jackson Hewitt was not a "credit services business" and therefore the MCSBA did not apply to it, the circuit court granted that motion, a decision that was subsequently affirmed by this Court. *Gomez v. Jackson Hewitt, Inc.*, 198 Md. App. 87 (2011).

Disappointed but undeterred, Gomez then filed a petition for a writ of certiorari in the Court of Appeals, hoping to obtain a more favorable resolution of this issue. That petition, in turn, elicited both a motion to intervene and joint petition for a writ of certiorari from the Commissioner and the Consumer Protection Division of the Office of the Maryland Attorney General, asking the Court of Appeals to determine whether the

13

MCSBA applied to a tax preparer that facilitates RALs but receives no direct payment from the consumer for that service. *Gomez*, 427 Md. at 132–33 & n.1–2.

Following the grant of those petitions, Gomez, the Consumer Protection Division, and the Commissioner contended, before the Court of Appeals, that the plain language of the MCSBA's definition of a "credit services business," as well as the act's legislative history, rendered it applicable to Jackson Hewitt. *Id*. at 142. Jackson Hewitt responded that it did not qualify as a "credit services business" because it did not, under the language of the MCSBA, assist Gomez in obtaining a RAL "***in return*** for the payment of money or other valuable consideration." *Id.* at 143 (emphasis in original). Rather, it maintained, it was paid, at most, "indirectly" by Gomez when SBBT, after issuing the RAL to Gomez, paid to Jackson Hewitt a portion of the loan amount for its services in preparing Gomez's tax return. *Id.* at 136.

The Court of Appeals agreed with Jackson Hewitt's interpretation of the statute. *Id.* at 178. After quoting the MCSBA, that to be subject to that act, an entity must provide credit services "***in return*** for the payment of money or other valuable consideration," the Court expounded that, "in the context of the [M]CSBA," the term "'in return' can reasonably be understood to envision an exchange of assistance for payment between the consumer and the provider of that assistance and to mean that any payment to the credit services business for such assistance in obtaining an extension of credit must come ***directly*** from ***the consumer***." *Id*. at 154 (emphasis in original). As it was undisputed that Gomez made no "direct payment" to Jackson Hewitt in return for its assistance in obtaining a RAL,

14

the Court held that Jackson Hewitt was not a "credit services business" and was therefore not subject to the MCSBA. *Id.* at 155, 178.

During its review of that issue, the *Gomez* Court undertook a thorough and comprehensive survey of the legislative history of the MCSBA to "confirm[]" that the act was "not intended to regulate RAL facilitators who do not receive compensation directly from the consumer." *Id.* at 159. The salient points made by the Court, in its survey of the legislative history of the act, were the following: The MCSBA was enacted in 1987 to regulate "credit repair agencies." *Id.* at 160. Its enactment was the result of the legislature's concern about the "predatory practices and misleading advertising" of businesses that "take fees from consumers to improve or extend credit, or to give advice or assistance in such matters," and the MCSBA was enacted to "target" such businesses. *Id.* at 161–62.

The Court further noted that, in 2001, the legislature amended the act by adding to the list of activities that a credit services business was proscribed from engaging in: assisting a consumer in "obtain[ing] an extension of unsecured closed end credit at a rate of interest which, except for federal preemption of State law," would be prohibited by Maryland law. *Id.* at 162–63. The purpose of this amendment was to target "payday lenders" that were "partnering with a federal bank in order to 'import' [interest] rates into Maryland." *Id.* at 163. Specifically, the amendment was "aimed" at third-party arrangements between "federally-insured depository institutions" and "local agents (usually a check cashing business) to broker such loans," and was intended to ensure the "ability to enforce [Maryland's] small loan laws by ***prohibiting a broker from arranging a loan*** that is otherwise illegal by state law." *Id.* at 164 (emphasis in original).

15

The following year, in 2002, the legislature, as the Court of Appeals observed, expanded that prohibition by amending the act to apply to "an extension of unsecured closed end credit or closed end credit **secured by personal property** at a rate of interest which, except for federal preemption of State law," would be prohibited by Maryland law. *Id.* at 166 (emphasis added). This amendment rendered the MCSBA applicable to "***any*** extension of credit." *Id.* (emphasis in original). The focus of the 2002 amendment, however, was still on payday lenders because the 2001 enactment had, in the words of the "Fiscal Note" accompanying this amendment when it was proposed, "fail[ed] in fact to prevent payday lending as intended," and this new amendment, it was hoped, would "achieve the results the legislature [had] intended" to achieve the year before. *Id.* (emphasis omitted).

Eight years later, in 2010, the MCSBA was amended once more. That amendment prohibited a credit services business from "charg[ing] or receiv[ing] any money or other valuable consideration in connection with an extension of credit that, when combined with any interest charged on the extension of credit, would exceed the interest rate permitted for the extension of credit under the applicable title of this article." *Id.* at 167. It "clarifie[d]" that "all fees associated with a payday loan" fell under Maryland's "usury cap." *Id.* Quoting the "sponsor" of the amendment, the *Gomez* Court observed that the legislature, in passing the amendment, was attempting to address "the gouging of the public by essentially one company," based in another state, which charged "up to 600 percent for a payday loan" once all fees were calculated. *Id.*

16

The foregoing legislative history showed, according to the Court of Appeals, that the MCSBA "was clearly industry specific," as it targeted third-party business that were "partnering with a federal bank in order to 'import' [interest] rates into Maryland." *Id.* at 169, 163. But "[w]e are not persuaded," the Court advised, "that such industry-specific legislation indicates the General Assembly's intent to regulate income tax preparers that assist their clients receiving, through a third-party lender, a RAL, if they do not receive any payment directly from the consumer for that assistance." *Id.* at 169.

## V.

With that analysis of the legislative history of the MCSBA in mind, we return to the question presented by the instant appeal and specifically to CashCall's assertion that, in order to be a "credit services business" under the MCSBA, it had to have received "direct payment" from Maryland consumers, which CashCall maintains it did not. CashCall reasons that, because Maryland consumers did not pay a fee to CashCall for its loan arrangement services, it did not receive "the payment of money or other valuable consideration" in return for obtaining extensions of credit for consumers.

The Commissioner flatly rejected that claim below, as he now does on appeal. He maintains that he correctly determined that CashCall did, in fact, receive "direct payment" from the consumers for whom it arranged loans. And, even if that did not occur, the "direct payment" requirement, in *Gomez*, was never intended to apply beyond the factual boundaries of that case, and certainly it was not intended to extend to companies, like CashCall, whose "sole purpose" is to arrange loans for Maryland consumers and thereby exclude the very businesses that the MCSBA was intended to cover.

17

We agree with the Commissioner that the Court of Appeals, in rendering its decision in *Gomez*, did not intend to establish a universal rule, and that the "direct payment" requirement was not meant to apply to a company, like CashCall, which is exclusively engaged in assisting Maryland consumers to obtain small loans bearing annual interest rates that would be, under Maryland law, usurious and then, to further profit from this activity, immediately purchases the loans after their issuance and thereafter collects all payments due on the loans from the consumer, including the "rolled in" origination fee.

We begin, as the Commissioner did in his final order, by recognizing that the Court of Appeals, in *Gomez*, was asked to address a set of facts quite different from those presently before us. The facts in *Gomez* established that there were, in the Commissioner's words, "two separate commercial relationships" between Gomez and Jackson Hewitt: one relationship for tax preparation purposes and the other for facilitating the RAL. But Jackson Hewitt's "primary commercial and contractual relationship" with Gomez and its other clients was "related to tax preparation," said the Commissioner, and "not to obtaining an extension of credit." Consequently, for Jackson Hewitt to be subject to the MCSBA, "a direct payment for the credit services [was] necessary to define what party fulfilled what role in these separate commercial transactions."

It was, indeed, this dual relationship between Gomez and Jackson Hewitt, with loan arrangement playing a relatively minor role in their business relationship, that appeared to trouble the Court of Appeals and led it to express concern about the consequences of applying the MCSBA to instances where the credit services provided by a business to a consumer are only ancillary to the primary relationship between the business and the

18

consumer. This could lead, the *Gomez* Court noted, to "absurd results," rendering the MCSBA applicable "to tremendous numbers of retailers throughout Maryland who have never registered under the [M]CSBA." 427 Md. at 138. It pointed out that "mainstream businesses" like "department stores, electronic retailers, big box retailers, book stores, gas stations[, and] clothing retailers," which are not primarily engaged in "credit services business" with consumers but "routinely offer assistance to customers with applications for credit offered by third-party banks in exchange for compensation from the banks," would be, under a broad application of the "direct payment" requirement, subject to the MCSBA for the assistance they provided to consumers in applying for credit offered by third parties. *Id.* at 159. Given the articulation of these concerns by the Court of Appeals, we believe that Maryland's highest court was impliedly suggesting that the "direct payment" requirement set forth in *Gomez* was intended to apply only to "mainstream" businesses that, like Jackson Hewitt, offer loan arrangement services as an ancillary service, separate and distinct from the principal services they provide to Maryland consumers.

Indeed, CashCall is obviously not, as the Commissioner observed, the type of business that the Court of Appeals was confronted with, and concerned about, in *Gomez*. In contrast to Jackson Hewitt, whose primary business is tax preparation and who provided assistance in obtaining RALs as an ancillary service to its customers, CashCall's loan arrangement service was, as the Commissioner noted, the ***only*** service CashCall provided. There was no evidence, declared the Commissioner, that CashCall "provided any other services to the consumers" other than arranging loans. And, since the nature of the

19

commercial relationship between CashCall and Maryland consumers was clear, it was not necessary, opined the Commissioner, to make the "applicability of the MCSBA contingent on whether a consumer has made a 'direct' payment to CashCall." We agree. The concerns that prompted the Court of Appeals in *Gomez* to require a "direct payment" from the consumer to the business entity in exchange for credit services simply do not exist here.

Moreover, the amendments made to the MCSBA in 2001, 2002, and 2010, were meant, as the Commissioner put it, to "encompass[] third parties who, partnering with out-of-state banks, facilitate predatory lending against Maryland consumers." The legislature's intent, averred the Commissioner, was to protect Maryland consumers from "schemes" in which a third-party business, like CashCall, entered into an agreement with an out-of-state bank to arrange a loan, from the bank to the consumer, at interest rates prohibited by Maryland law, regardless of whether that third party received "direct payment" from the consumer.

We agree that CashCall's business practices, viewed in the light of the MCSBA's goal of protecting Maryland consumers from the lending practices of companies marketing high-interest small loans and partnering with out-of-state banks in order to charge what would otherwise be usurious rates of interest, are precisely the sort of business activities that the act and its amendments were enacted to prevent. To make the MCSBA's applicability contingent on a "direct payment" from the consumer to the business entity, under any and all circumstances, would undermine the protections for Maryland consumers the legislature strove so hard to put in place.

20

## VI.

Moreover, even if it were the case (though we do not believe that it is) that an enterprise, regardless of the nature of its business and the services it provides, cannot be a "credit services business" unless it is directly paid by the consumers it serviced, the direct-payment requirement was, as the Commissioner found, satisfied here. CashCall did, in fact, receive direct payment from Maryland consumers for the preparation and processing of the loans it arranged for them.

To illustrate how this occurred, we shall briefly revisit the loan arrangement services offered and provided by CashCall. To begin with, once CashCall had gained the attention, through its advertisements, of a Maryland consumer interested in obtaining a small loan, CashCall then assisted that consumer in applying for such a loan at an annual interest rate from 59% to 96%, a range of interest rates deemed usurious by Maryland law. That assistance consisted of offering advice, supplying a loan application form, and providing assistance, over the telephone, to the interested consumer in completing the application. Upon completion of that application by the interested consumer, CashCall would transmit the application to one of two out-of-state banks for approval. After the loan was approved, the bank would transfer the loan to the consumer's account, less an "origination fee." The consumer remained obligated, however, to pay to the holder of the loan that origination fee, which was, in the Commissioner's words, "rolled into the principal amount of the loan."

Then, three days after the bank funded the loan, CashCall would purchase, from the bank, the loan, which encompassed the origination fee. CashCall thereafter had the right

to collect, directly from the borrowing Maryland consumers, all loan payments, interest, and fees due under the loan. Thus, CashCall received, directly from each Maryland consumer for whom it had arranged a loan, payment of the origination fee.

It is of no consequence that the origination fee was originally charged by the lending bank. The bank never received payment of that fee from the consumer but, as noted, CashCall did. Nor does it matter that the payments for the origination fee were made as part of the payments on the principal amount of the loan. That arrangement affected how payment of the origination fee was to be made, but not what the payment was for, who made it (the consumer), or who received it (CashCall).

Finally, we feel impelled to note, and express our agreement with, the statement made by the Commissioner, in his final order, that if we were to accept CashCall's contention that it received no direct payments for its services—despite the fact that the out-of-state banks never actually received, from any of the recipients of those loans, any payments for the loans that they had issued, while CashCall did—we would have to "accept that any credit services business is permitted to re-direct the path of a consumer payment through a myriad of creative business structures and transactions and avoid the MCSBA." We decline to do so and conclude that CashCall, by collecting the origination fee paid by the borrowing consumer, received "direct payment" from the consumers and therefore was, if that be the standard here, a "credit services business" under the MCSBA.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE ORDER OF THE COMMISSIONER. COSTS TO BE PAID BY APPELLEES.**