*CashCall, Inc., and J. Paul Reddam v. Maryland Commissioner of Financial Regulation*, No. 80, September Term 2015, Opinion by Greene, J.

**COMMERCIAL LAW — MARYLAND CREDIT SERVICES BUSINESS ACT— DEFINITION OF "CREDIT SERVICES BUSINESS"**

The definition of "credit services business" pursuant to Md. Code (1975, 2013 Repl. Vol., 2015 Cum. Supp.), § 14-1901(e) of the Commercial Law Article does not require there to be a direct payment from a consumer to an entity who markets, facilitates, and then promptly acquires the loans it arranges. Pursuant to § 14-1901(e), any individual or company that engages in such business practices in return for remuneration for obtaining "an extension of credit by others" for a consumer is subject to the Maryland Credit Services Business Act.

Circuit Court for Baltimore City
Case No. 24-C-12-007787
Argued: April 4, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 80
September Term, 2015

---

CASHCALL, INC., AND J. PAUL REDDAM

v.

MARYLAND COMMISSIONER OF
FINANCIAL REGULATION

---

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Wilner, Alan M. (Retired,
Specially Assigned),

　　JJ.

---

Opinion by Greene, J.

---

Filed: June 23, 2016

*Battaglia, J., now retired, participated in the hearing
and conference of this case while an active member of
this Court; after being recalled pursuant to the
Constitution, Article IV, Section 3A, she also
participated in the decision and adoption of this
opinion.

In the instant case, we address whether the definition of a "credit services business" under the Maryland Credit Services Business Act ("the MCSBA")[1] requires there to be a direct payment from a consumer to a company whose primary business is to assist consumers in obtaining loans that would be usurious under Maryland law. The Commissioner of Financial Regulation of the Department of Labor, Licensing, and Regulation ("the Commissioner")[2] brought an administrative enforcement action against Petitioners, CashCall, Inc. ("CashCall"), a California corporation, and John Paul Reddam ("Reddam"), the corporation's president and owner, for violating various Maryland consumer protection laws, including the MCSBA. Petitioners disagreed that their business activities fell within the purview of the MCSBA, claiming that our holding in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 46 A.3d 443 (2012) established a broad "direct payment" requirement within the MCSBA's definition of a credit services business. We shall clarify the holding in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. at 128, 46 A.3d at 443 by limiting its discussion of a "direct payment" requirement to the circumstances of that case. For the reasons explained below, we hold that the definition of a credit services business does not contain a broad direct payment requirement.

## FACTUAL AND PROCEDURAL BACKGROUND

A person or entity engaged in providing credit services business is subject to

---

[1] The MCSBA is codified in Md. Code (1975, 2013 Repl. Vol., 2015 Cum. Supp.), Title 14, Subtitle 19, of the Commercial Law Article ("CL").

[2] *See* CL § 14-1901(b) and Md. Code (1980, 2011 Repl. Vol., 2015 Cum. Supp.), § 1-101(g) of the Financial Institutions Article ("FI").

regulation under Maryland law.  Under CL § 14-1901(e),

>(1) "Credit services business" means any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services in return for the payment of money or other valuable consideration:
>>(i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record;
>>(ii) Obtaining an extension of credit[3] for a consumer; or
>>(iii) Providing advice or assistance to a consumer with regard to either subparagraph (i) or (ii) of this paragraph.
>
>(2) "Credit services business" includes a person who sells or attempts to sell written materials containing information that the person represents will enable a consumer to establish a new credit file or record.[4]

---

[3] "'Extension of credit' means the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes."  CL § 14-1901(f).

[4] CL § 14-1901(e)(3) further states:
>"Credit services business" does not include:
>(i) Any person authorized to make loans or extensions of credit under the laws of this State or the United States who is actively engaged in the business of making loans or other extensions of credit to residents of this State;
>(ii) Any bank, trust company, savings bank, or savings and loan association whose deposits or accounts are eligible for insurance by the Federal Deposit Insurance Corporation or any credit union organized and chartered under the laws of this State or the United States;
>(iii) Any nonprofit organization exempt from taxation under § 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3));
>(iv) Any person licensed as a real estate broker, an associate real estate broker, or a real estate salesperson by this State where the person is acting within the course and scope of that license;
>(v) Any person licensed as a mortgage lender by this State;
>(vi) An individual admitted to the Bar of the Court of Appeals of Maryland when the individual renders services within the course and scope of practice by the individual as a lawyer and does not engage in the credit services business on a regular and continuing basis;
>(vii) Any broker-dealer registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission where the

Under CL and FI, a credit services business must comply with various requirements imposed by statute. Most relevant to this case is the requirement that a credit services business is prohibited from assisting "a consumer to obtain an extension of credit at a rate of interest which, except for federal preemption of State law" would exceed the maximum annual percentage rates under Maryland Law.[5] CL § 14-1902(9). *See* CL § 12-102. Although federal law[6] allows federally insured banks to charge out-of-state consumers the same interest rate permitted by the bank's home state, regardless of the interest rate caps imposed by the law of the consumer's resident state, "a credit services business may not, under the MCSBA, assist a consumer in obtaining a loan, from any in-state or out-of-state bank, at an interest rate prohibited by Maryland law." *Maryland Comm'r of Fin. Regulation v. CashCall, Inc.*, 225 Md. App. 313, 325, 124 A.3d 670, 677 (2015).

---

broker-dealer is acting within the course and scope of that regulation;
(viii) Any consumer reporting agency as defined in the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681 et seq.) or in § 14-1201(e) of this title;
(ix) An individual licensed by the Maryland Board of Public Accountancy when the individual renders services within the course and scope of practice by the individual as a certified public accountant and does not engage in the credit services business on a regular and continuing basis; or
(x) Beginning July 1, 2013, a mortgage assistance relief service provider regulated under Title 7, Subtitle 5 of the Real Property Article.

[5] A credit services business is also subject to various other requirements. A credit services business must be licensed by the State. *See* CL § 14-1902(1); CL § 14-1903(b); FI § 11-302(b), FI § 11-303. A credit services business must display its license number in its advertisements, provide consumers with a written information statement and obtain a surety bond. *See* CL §§ 14-1903.1; 14-1904, 14-1905; 14-1908.

[6] 12 U.S.C. § 1831d.

3

**CashCall's Business Activities**

CashCall marketed high-interest loans to consumers through television and internet advertisements. The advertisements contained information regarding CashCall's website and telephone number. CashCall offered loans to consumers at three different interest rates: 59%, 89%, or 96%.[7] These interest rates greatly exceeded the interest rates permitted by Maryland law, which caps the interest rate at 33% on all loans below $6,000.[8] Between January 2006 and December 2010, through CashCall, Maryland consumers received 5,651 loans in amounts less than $6,000 with interest rates greater than 33%.

Maryland consumers who visited the CashCall website or called CashCall directly were directed to fill out an online loan application though CashCall's website. CashCall then forwarded the completed application to a federally insured out-of-state bank that is exempt from Maryland's usury laws. Once a bank approved a loan application, the bank would place, in the consumer's bank account, the requested loan amount less a $75 fee designated as an "origination fee."[9] The following example is illustrative of a typical transaction: In the case of a $2,600 approved loan, the consumer receives $2,525, which is the principal amount owed on the loan less the $75 origination fee. The consumer is required to pay the holder of the loan $2,600, plus interest. In other words, "the consumer ultimately pa[ys] the

[7] The interest rate increased as the amount borrowed decreased.

[8] *See* CL §§ 12-306, 12-313, and 12-314.

[9] An "origination fee" is "a fee charged by a lender for preparing and processing a loan." BLACK'S LAW DICTIONARY 732 (Bryan A. Garner ed., 10th ed. 2014).

origination fee as he or she repa[ys] the loan in monthly installments to whomever [holds] the loan." *CashCall, Inc.*, 225 Md. App. at 318, 124 A.3d at 673.

Specifically, CashCall had entered into partnerships with First Bank & Trust, a South Dakota-chartered bank and First Bank of Delaware, a Delaware-chartered bank. Pursuant to contracts between CashCall and each bank, CashCall was required to purchase a loan three days after[10] the loan was originated and the funds dispersed to the consumer.[11] CashCall paid the bank the full value of the loan, i.e., the $2,600 from the example above, plus the three days of interest that had accrued on the loan. The banks also paid CashCall a "royalty" fee of $5 to $72.22 per loan depending on the amount of the loan and the bank that disbursed the funds. Upon CashCall's purchase of the loan, all of the bank's rights and interests in the loan were assigned, without recourse, to CashCall. This gave CashCall the right to enforce the terms provided in the loan documents, including the right to collect payments of the principal, interest and other fees.[12] In fact, if the bank mistakenly received

---

[10] The original contract required CashCall to purchase the loan "on the same business day." This contract was later amended to require CashCall to purchase a loan three days after its origination.

[11] At the hearing before the Office of Administrative Hearings on September 14, 2010, Daniel Baren, corporate designee for CashCall, stipulated that the contracts between CashCall and each bank obligated CashCall to purchase the loan three days after it was originated. It was further stipulated that the contracts prohibited the banks from selling the loan to anyone else.

[12] It appears that CashCall's business activities constitute a "rent-a-bank" scheme. In a "rent-a-bank" scheme, a payday lender partners with a federally insured bank to take advantage of the bank's exemption from state usury caps. John D. Skees, *The Resurrection of Historic Usury Principles for Consumption Loans in a Federal Banking System*, 55

5

a payment from a consumer on a loan CashCall purchased, the bank was required to hold the payment "in trust" and forward the payment to CashCall no later than the following business day.

Given the nature of the partnership between CashCall and the banks, Maryland consumers who obtained loans through CashCall dealt primarily with CashCall. A consumer's contact with the bank was limited to a single transaction: the bank's deposit of money into the consumer's bank account. Maryland consumers communicated with CashCall, and made all loan payments whether it be for principal, interest, or any other fees directly to CashCall.

**The Enforcement Action**

Between 2007 and 2011, eighteen Maryland residents filed complaints with the Commissioner. Based on these complaints, the Commissioner initiated an investigation into the business practices of CashCall and Reddam.[13] On June 23, 2009, in a "Summary Order

CATHOLIC U. L. REV. 1131, 1150–52 (2006). In these partnerships, the federally insured bank makes the loan and the payday lender immediately purchases the loan from the bank. *Id.* This arrangement, in effect, allows a payday lender to rent the bank's charter in order to make loans that exceed state interest caps. *Id.*

[13] FI § 2-114 provides in pertinent part:
    (a) The Commissioner may:
    (1) Make public or private investigations as the Commissioner considers necessary to:
        (i) Determine whether a person has violated a provision of law, regulation, rule, or order over which the Commissioner has jurisdiction; or
        (ii) Aid in the enforcement of a law or in the prescribing of regulations, rules, and orders over which the Commissioner has jurisdiction;

to Cease and Desist,"[14]  the Commissioner found that "[Petitioners] engaged in illegal and predatory business activities which directly resulted in Maryland consumers obtaining usurious loans from national banks" in violation of the MCSBA.  In response, on July 7, 2009, Petitioners requested a hearing in the Office of Administrative Hearings ("OAH").

On September 14, 2010, administrative law judge ("ALJ") Nancy E. Paige  held a hearing on the Summary Order.  In ALJ Paige's December 2, 2010 "Proposed Decision," she

(2) Require or permit a person to file a statement in writing, under oath or otherwise as the Commissioner determines, as to all the facts and circumstances concerning the matter to be investigated; and
(3) Subject to the provisions of Title 4 of the General Provisions Article, publish information concerning a violation of a law, regulation, rule, or order over which the Commissioner has jurisdiction.

(b) For the purpose of an investigation or proceeding, the Commissioner or an officer designated by the Commissioner may administer oaths and affirmations, subpoena witnesses, compel witness attendance, take evidence, and require the production of books, papers, correspondence, memoranda, agreements, or other documents or records that the Commissioner considers relevant or material to the inquiry.

[14] FI § 2-115 provides in pertinent part:
(a) When the Commissioner determines that a person has engaged in an act or practice constituting a violation of a law, regulation, rule or order over which the Commissioner has jurisdiction, and that immediate action against the person is in the public interest, the Commissioner may in the Commissioner's discretion issue, without a prior hearing, a summary order directing the person to cease and desist from engaging in the activity, provided that the summary cease and desist order gives the person:
(1) Notice of the opportunity for a hearing before the Commissioner to determine whether the summary cease and desist order should be vacated, modified, or entered as final; and
(2) Notice that the summary cease and desist order will be entered as final if the person does not request a hearing within 15 days of receipt of the summary cease and desist order.

concluded that Petitioners violated the MCSBA and the licensing provisions of the Maryland Consumer Loan Law.[15] Characterizing each of the 5,651 loans Petitioners offered to a Maryland consumer as a first offense, ALJ Paige proposed a penalty of $1,000 for each loan, for a total civil penalty of $5,651,000. ALJ Paige further recommended that the Commissioner "[e]nter a final Order that [Petitioners] cease and desist from engaging in the 'credit services business[]'" and ordered CashCall to pay the full civil penalty of $5,651,000. Petitioners filed exceptions to the ALJ Paige's "Proposed Order" on January 20, 2011. The parties agreed to stay the matter pending the outcome of a case for which we had granted *certiorari* on October 24, 2011, *Gomez v. Jackson Hewitt, Inc.*, 422 Md. 352, 30 A.3d 193 (2011) This Court issued its opinion in *Gomez*, 427 Md. at 128, 46 A.3d at 443 on June 22, 2012.

In the aftermath of *Gomez*, Commissioner Mark Kaufman held a hearing on the exceptions filed in this case on August 10, 2012 and issued an "Opinion and Final Order" ("Final Order") on November 8, 2012. In his Final Order, Commissioner Kaufman explained that the representative promissory note and disclosure statement ALJ Paige admitted into evidence demonstrates how consumers made payments directly to CashCall:

> [Petitioners'] Exhibit #1 (admitted in the OAH hearing) is the First Bank & Trust Promissory Note and Disclosure Statement, dated as of December 12, 2006 (the "Promissory Note") for a $2,600 consumer loan. The "financed"

_____

[15] FI § 11-303 provides that "[a] license under this subtitle shall be applied for and issued in accordance with, and is subject to, the licensing and investigatory provisions of Subtitle 2 of this title, the Maryland Consumer Loan Law — Licensing Provisions."

amount of the loan is shown as $2,525.00. This is the amount received by the consumer. A "Prepaid Finance Charge/Origination Fee" is listed at $75.00. The $75.00 fee is rolled into the principal amount of the loan. As a result, the total amount of principal due from the consumer is $2,600.00.

In order to understand the significance of the $75 fee, one must turn back to the Sealed Agreements [contracts between CashCall and the bank] . . . . [W]hen CashCall purchased a loan, CashCall paid for the outstanding balance due, including all principal, interest origination fees, and other charges or sums owed by the borrower. In other words, CashCall paid $2,600 for the loan. Because the loan was transferred from the bank to CashCall three days later, the consumer did not make a single payment to the bank . . . . The consumer, however, directly paid CashCall, not the bank, because CashCall collected on the loan, which included the $75.00.

(footnote omitted).

Moreover, Commissioner Kaufman rejected Petitioner's argument that *Gomez*, 427 Md. at 128, 46 A.3d at 443 applied to the Petitioners' case. He distinguished *Gomez* factually:

In *Gomez*, the fees to Jackson Hewitt for *tax preparation* were rolled into the principal amount of the loan *and* the lending bank, not Jackson Hewitt, collected on the loan. The lending bank then paid Jackson Hewitt, resulting in no direct payment by the consumer to Jackson Hewitt. Here, the consumer paid CashCall for the principal, interest, and *fees* on the loan.

(emphasis in original). Commissioner Kaufman also conducted an analysis of *Gomez* and concluded that "*Gomez* applies to tax preparers who were marketing refund anticipation loans in the context of tax preparation services." He explained:

One of the concerns of the Court of Appeals was that allowing indirect payment to trigger the application the MCSBA in the context of refund anticipation loans could lead to "the absurd results in applying the statute to tremendous numbers of retailers throughout Maryland who have never registered under the [M]CSBA." *Gomez*, 427 Md. at 138. Specifically, the

9

Court was concerned that "department stores, electronic retailers, big box retailers, bookstores, gas stations[, and] clothing retailers" would be subject to the MCSBA when assisting consumers in applying for credit offered by third-party banks. *Gomez*, 427 Md. at 159. The Court was clearly focused on the fact that the extension of credit was related to the services of the facilitator of the loan, *but* the primary commercial and contractual relationship between Ms. Gomez and Jackson Hewitt was related to tax preparation, not obtaining an extension of credit. The extension of credit was merely collateral to Jackson Hewitt's primary service of preparing tax returns. On the other hand, CashCall's solicitation, website applications, support services and assistance to consumers, and processing all zeroed in on obtaining a loan for a consumer. The record in this matter contains no evidence that CashCall provided any other services to the consumers. Application of the MCSBA to CashCall in this context creates no risk that department stores, retailers, or gas stations could be swept within the scope of the MCSBA.

(alterations and emphasis in original). Commissioner Kaufman also emphasized this Court's detailed analysis of the legislative history of the MCSBA. After recounting the legislative history of the MCSBA, as discussed in *Gomez*, he concluded that "a 'marketer' of loans for out-of state banks who receives an indirect payment from a consumer for providing services to facilitate a high-interest, small-dollar consumer loan is subject to the MCSBA and the Commissioner's jurisdiction to enforce the MCSBA." Thus, he ordered that Petitioners "cease and desist from engaging in the 'credit services business[]'" and pay to the Commissioner "a civil penalty of $5,651,000.00 within 30 days."

On December 7, 2012, CashCall filed a timely petition for judicial review of the Final Order and a motion to stay the Final Order in the Circuit Court for Baltimore City. Reddam did not file a petition for judicial review at that time. On April 11, 2013, however, CashCall and Reddam filed an amended petition for judicial review solely for the purpose of adding

10

Reddam as a petitioner. The Circuit Court dismissed the amended petition for judicial review as untimely, eliminating Reddam as a party to the judicial review proceeding. Despite noting that CashCall may be "a predatory entity preying on the consumers of Maryland and has developed a scheme to evade the usory [sic] laws of Maryland," the Circuit Court reversed the Final Order on July 3, 2013. In its "Memorandum and Order," it explained that the *Gomez* decision requires a direct payment between a business and a consumer under the MCSBA. Therefore, it concluded that CashCall was not a "credit services business" under the MCSBA. The Circuit Court further issued a "*NUN PRO TUNC* Order" to clarify that its reversal of the Final Order applied only to CashCall and not Reddam because Reddam was not a party to the judicial review proceeding. As a result, the Final Order against Reddam was intact and enforceable against him.

On September 18, 2013, the Commissioner filed a Notice of Appeal to the Court of Special Appeals.[16] The intermediate appellate court conducted a comprehensive review of this Court's decision in *Gomez* and of the MCSBA, including its legislative history. In a reported opinion, *Maryland Comm'r of Fin. Regulation v. CashCall, Inc.*, 225 Md. App. 313, 124 A.3d 670 (2015), the Court of Special Appeals affirmed the Final Order. We granted

---

[16] CashCall and Reddam filed a cross-appeal to challenge the Circuit Court's dismissal of their amended petition for judicial review and the court's "*NUN PRO TUNC* Order" limiting its reversal of the Final Order to CashCall. The Court of Special Appeals determined these issues to be moot, as it reversed the judgment of the Circuit Court, holding that CashCall violated the MCSBA. *CashCall, Inc.*, 225 Md. App. at 322, n.7, 124 A.3d 675, n.7. We need not address these issues because as we explain below, we affirm the judgment of the Court of Special Appeals.

11

*certiorari*, *CashCall, Inc. v. Comm'r of Fin. Regulation*, 445 Md. 487, 128 A.3d 51 (2015), to answer the following questions, which we have consolidated and rephrased:[17]

> Does the MCSBA's definition of a "credit services business" require there to be a direct payment from a consumer to an entity whose primary business is to market, facilitate, and ultimately acquire the loans it arranged?

For the reasons stated below, we shall answer this question in the negative. Accordingly, the judgment of the Court of Special Appeals is affirmed.

## STANDARD OF REVIEW

Review of most administrative agency decisions, such as the present one, is governed by the Maryland Administrative Procedure Act, Md. Code (1984, 2014 Repl.Vol.), § 10-222 of the State Government Article. *Bayly Crossing, LLC v. Consumer Prot. Div., Office of Atty. Gen.*, 417 Md. 128, 136, 9 A.3d 4, 8–9 (2010). In an appeal from the judicial review of an administrative agency's decision, "we look through the decisions of the circuit courts and intermediate appellate court, and evaluate the agency decision directly." *W.R. Grace & Co. v. Swedo*, 439 Md. 441, 452–53, 96 A.3d 210, 217 (2014). When a party challenges how

---

[17] Petitioners presented the following questions:

> 1. Did the COSA err in holding that the Act ["MCSBA"] does not require "'a direct payment' from the consumer," despite this Court's contrary ruling in *Gomez*, that the Act requires that "any payment … must come *directly* from the *consumer*"?
> 2. Can a borrower's repayments of principal and interest be treated as a fee paid "directly" "in return" for a loan marketer's mere *assistance* in obtaining the loan, simply because the principal previously included an origination fee whose benefits inured entirely to the original third-party lender?

(emphasis in original).

12

an agency applied, as opposed to interpreted, a statute, the party raises a mixed question of law and fact. *Bayly Crossing, LLC*, 417 Md. at 138, 9 A.3d at 10. "We [] apply the substantial evidence standard when reviewing mixed questions of law and fact." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005). The standard for substantial evidence review is "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Christopher v. Dept. of Health*, 381 Md. 188, 199, 849 A.2d 46, 52 (2004) (quoting *Board of Physician v. Banks*, 354 Md. 59, 68, 729 A.2d 376, 380 (1999)).

## DISCUSSION

CashCall argues that this Court's decision in *Gomez*, 427 Md. at 128, 46 A.3d at 443 made it clear that the plain language of CL § 14-1901 requires the consumer to have made a direct payment to a business like theirs in order to fall within the ambit of the MCSBA. Distinguishing the case *sub judice* from *Gomez*, the Commissioner counters that the direct payment requirement discussed in *Gomez* does not apply to companies like CashCall, whose sole business is to arrange loans for consumers. We agree and provide clarity as to the meaning of what constitutes a "credit services business" under the MCSBA.

### *Gomez v. Jackson Hewitt*

In *Gomez v. Jackson Hewitt*, we were called upon to decide whether the MCSBA applied to "a tax preparer who receives payment from a lending bank for 'facilitating' a

13

consumer's obtention of a refund anticipation loan ("RAL"),[18] where the tax preparer receives no direct payment from the consumer for this service[.]" 427 Md. at 133, 46 A.3d at 446. In *Gomez*, Jackson Hewitt, a provider of tax preparation services, had an agreement with a lender, Santa Barbara Bank & Trust ("SBBT"). 427 Md. at 134, 46 A.3d at 447. Pursuant to this agreement, SSBT would "offer, process, and administer certain financial products, including RALs" to Jackson Hewitt customers. *Id.* Jackson Hewitt facilitated these loans by informing its customers of the availability of a RAL and providing a loan application developed by SBBT. *Gomez*, 427 Md. at 135, 46 A.3d at 448. Under the program agreement, SBBT paid Jackson Hewitt a fixed annual fee as well as "variable payments tied to growth in the SBBT program." *Gomez*, 427 Md. at 135, 46 A.3d at 447.

Alicia Gomez alleged violations of the MCSBA after Jackson Hewitt prepared her federal income tax return and helped her obtain a RAL through the SBBT program. *Gomez*, 427 Md. at 133–34, 46 A.3d at 447.[19] Before this Court, Ms. Gomez, the Commissioner, and the Consumer Protection Division of the Office of the Maryland Attorney General[20] argued

---

[18] A RAL is "a loan arranged to be paid directly or indirectly from the proceeds of a consumer's tax refund." CL § 14-3801.

[19] The Circuit Court for Montgomery County dismissed Ms. Gomez's complaint for failure to state a claim and the Court of Special Appeals affirmed its decision. *Gomez*, 427 Md. at 139, 46 A.3d at 450.

[20] After Ms. Gomez filed a petition for certiorari in this Court, the Commissioner and the Consumer Protection Division of the Office of the Maryland Attorney General filed a joint motion to intervene and a joint petition for writ of certiorari, which were granted. *Gomez*, 427 Md. at 133, n.1, 46 A.3d 446, n.1.

14

that the "plain language of the [M]CSBA and its legislative history" supported the MCSBA's application to Jackson Hewitt. *Gomez*, 427 Md. at 142, 46 A.3d at 452. Jackson Hewitt disagreed, arguing that it did not qualify as a credit services business because it was not paid directly by the consumer. *Gomez*, 427 Md. at 147, 46 A.3d at 454.

This Court agreed with Jackson Hewitt, concluding that Jackson Hewitt was not a credit services business and therefore, not subject to the requirements of the MCSBA. *Gomez*, 427 Md. at 178, 46 A.3d at 473. We explained:

> In the context of the [M]CSBA and § 14–1901(e), "in return" can reasonably be understood to envision an exchange of assistance for payment between the consumer and the provider of that assistance and to mean that any payment to the credit services business for such assistance in obtaining the extension of credit must come *directly* from *the consumer*.

*Gomez*, 427 Md. at 154, 46 A.3d at 459 (emphasis in original). This Court also conducted an extensive analysis of the legislative history of the MCSBA and the General Assembly's enactment of RAL legislation in 2010 to confirm that "the most logical reading of the [M]CSBA as a whole is that it was not intended to regulate RAL facilitators who do not receive compensation directly from the consumer." *Gomez*, 427 Md. at 159, 46 A.3d at 462. The Court of Special Appeals appropriately recognized that

> in rendering its decision in *Gomez*, [the Court of Appeals] did not intend to establish a universal rule, and that the "direct payment" requirement was not meant to apply to a company, like CashCall, which is exclusively engaged in assisting Maryland consumers to obtain small loans bearing annual interest rates that would be, under Maryland law, usurious and then, to further profit from this activity, immediately purchases the loans after their issuance and thereafter collects all payments due on the loans from the consumer, including the "rolled in" origination fee.

15

*CashCall, Inc.*, 225 Md. App. at 330–31, 124 A.3d at 680. We agree and now make it clear that the "direct payment" requirement as set forth in *Gomez* is limited to the circumstances before the Court in that case, i.e., "a tax preparer who receives payment from a lending bank for 'facilitating' a consumer's obtention of a [RAL]." *Gomez*, 427 Md. at 133, 46 A.3d at 446.

Chief Judge Krauser noted, as did Commissioner Kaufman in his Final Order, that in *Gomez*, we were "asked to address a set of facts quite different from those presently before us." *CashCall, Inc.*, 225 Md. App. at 331, 124 A.3d at 680. "The facts in *Gomez* established that there were, in the Commissioner's words, 'two separate commercial relationships' between Ms. Gomez and Jackson Hewitt: one relationship for tax preparation purposes and the other for facilitating the RAL." *Id.* In his Final Order, Commissioner Kaufman astutely recognized that "the primary commercial and contractual relationship between Ms. Gomez and Jackson Hewitt was related to tax preparation, not obtaining an extension of credit" and that "[t]he extension of credit was merely collateral to Jackson Hewitt's primary service of preparing tax returns." In contrast, CashCall's business model revolves around the benefits it inures from purchasing and collecting principal, interest and all other fees on the very loans it assisted consumers in obtaining.

Ms. Gomez's allegation in her complaint that she "'*indirectly*' paid [Jackson Hewitt] for arranging the RAL" zones in on the annual fee SSBT paid to Jackson Hewitt for participation in the SBBT program. *Gomez*, 427 Md. at 137, 46 A.3d at 448–49 (emphasis

16

in original, footnote omitted). Ms. Gomez obtained a loan in the amount of $2,323. This

amount was composed of the following:

> $1,950.97 as the "[a]mount paid directly to [Ms. Gomez];"
> $284.00 as the **"[t]ax preparation fees** paid to" [Jackson Hewitt];
> $29.95 as the "SBBT tax refund account handing fee;" and
> $58.08 as the "total prepaid finance charge (SBBT bank fee)."

*Gomez*, 427 Md. at 136, 46 A.3d at 448 (emphasis added). As a result, the payment for

Jackson Hewitt's role in "providing advice or assistance to a consumer with regard to . . .

[o]btaining an extension of credit for a consumer" was characterized as "indirect" because

Ms. Gomez contended that SSBT used the income from the $88.03 in fees it charged her to

pay Jackson Hewitt the fixed annual fee and payments tied to growth under the SBBT

program. CL § 14-1901(e). *See Gomez*, 427 Md. at 137, n.12, 46 A.3d at 449, n.12.

It is evident that the $284 amount SBBT paid to Jackson Hewitt was the amount Ms.

Gomez owed Jackson Hewitt for **tax preparation services**. The lending bank paid Jackson

Hewitt separately, from its own funds, for Jackson Hewitt's role in facilitating the RAL. To

surmise, as Ms. Gomez did, that the lending bank categorically paid Jackson Hewitt for its

RAL facilitation role out of the exact income it obtained from the consumer through the

SBBT program, rather than income it obtained elsewhere through business activities

unrelated to the SBBT program is, at best, conjecture. Thus, the link between the fees paid

by Ms. Gomez to SBBT as the "SBBT tax refund account handling fee" and the "total

prepaid finance charge (SBBT bank fee)," and the independent payments SBBT made to

Jackson Hewitt as part of the SBBT program is tenuous. *Gomez*, 427 Md. at 136, 46 A.3d

17

at 448.  Based on this particular scenario, this Court recognized that Ms. Gomez's "interpretation of the [M]CSBA would lead to absurd results in applying the statute to tremendous numbers of retailers throughout Maryland who have never registered under the [M]CSBA."  *Gomez*, 427 Md. at 138, 46 A.3d at 449.  Concluding that a "direct payment" requirement existed was appropriate under those circumstances to allay that concern.

That concern does not exist in the case *sub judice*.  The Final Order distinguishes the instant case from *Gomez*: "In *Gomez*, the fees to Jackson Hewitt for *tax preparation* were rolled into the principal amount of the loan *and* the lending bank, not Jackson Hewitt, collected on the loan." (emphasis in original).  Furthermore, "CashCall's solicitation, website applications, support services and assistance to consumers, and processing all zeroed in on obtaining a loan for a consumer.  The record in this matter contains no evidence that CashCall provided any other services to the consumers."  The Final Order also indicated that the "[a]pplication of the MCSBA to CashCall in this context creates no risk that department stores, retailers, or gas stations could be swept within the scope of the MCSBA."

Limiting the "direct payment" requirement to the facts of *Gomez* also comports with the principals of statutory construction:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature.  A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute.  If the language of the statute is unambiguous and

18

clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.

We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope . . . .

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*Gardner v. State*, 420 Md. 1, 8–9, 20 A.3d 801, 806 (2011) (citing *State v. Johnson*, 415 Md. 413, 421–22, 2 A.3d 368, 373 (2010). Proceeding on the assumption that Jackson Hewitt provided "advice or assistance to a consumer with regard to . . . [o]btaining an extension of credit for a consumer," this Court noted in *Gomez* that "to be subject to the [M]CSBA, [] 'advice or assistance' must be provided '*in return* for the payment of money or other valuable consideration[.]" 427 Md. at 154, 46 A.3d at 459 (citing CL § 14-1901(e)) (emphasis in original). This Court then consulted the dictionary definition of "in return." *Id.* MERRIAM WEBSTER COLLEGIATE DICTIONARY 1066 (11th ed. 2003) defines "in return" as "in reciprocation, compensation, or repayment." Nothing in this definition requires that the "reciprocation, compensation, or repayment" be made directly. *Id.* However, to read a broad "direct payment" requirement into the statute "add[s] . . . language so as to reflect an intent

19

not evidenced in the plain and unambiguous language of the statute." *Woznicki v. GEICO Gen. Ins. Co.*, 443 Md. 93, 108, 115 A.3d 152, 161 (2015) (citing *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 359, 65 A.3d 141, 148 (2013)).  Thus, we agree with the Court of Special Appeals that this Court's decision in *Gomez* was not intended "to apply beyond the factual boundaries of that case, and certainly it was not intended to extend to companies, like CashCall, whose 'sole purpose' is to arrange loans for Maryland consumers and thereby exclude the very businesses that the MCSBA was intended to cover." *CashCall, Inc.*, 225 Md. App. at 330, 124 A.3d at 680.

The Court's in-depth analysis in *Gomez* of the legislative history of the MCSBA, specifically the 2001, 2002, and 2010 amendments and the inception of the RAL legislation confirms our conclusion that the "direct payment" requirement is limited to the facts of that case.  427 Md. at 159, 46 A.3d  at 462 ("[T]he most logical reading of the [M]CSBA as a whole is that it was not intended to regulate RAL facilitators who do not receive compensation directly from the consumer.").  The MCSBA was enacted in 1987 with the inception of House Bill 472. *Id.*  The "Summary" section of the House of Delegates Floor Report on House Bill 472 states that "[t]his bill create[d] a new subtitle to regulate credit services businesses which accept fees for attempting to improve a consumer's credit record, history or rating, obtaining an extension of credit, *or* providing advice about either." *Gomez*, 427 Md. at 161, n.28, 46 A.3d at 463, n.28 (alterations and emphasis in original).

In 2001, the MCSBA was amended through Senate Bill 882, which was "*primarily*

*aimed at 'payday loans'*[21] and particularly, third party arrangements that some federally-insured depository such as national banks and federal savings and loan associations, have entered into with local agents (usually a check cashing business) to broker such loans." *Gomez*, 427 Md. at 164, 46 A.3d at 465 (emphasis in original). The very next year, the General Assembly again amended the MCSBA to provide broader protections to consumers by adding a prohibition against assisting "a consumer to obtain an extension of unsecured closed end credit *or closed end credit secured by personal property* at a rate of interest which, except for federal preemption of State law, would be prohibited under Title 12, Subtitle 1, 3, or 10 of [the] [CL] article." *Gomez*, 427 Md. at 166, 46 A.3d at 466 (emphasis in original). As a result, the 2002 amendment made the MCSBA applicable "to *any* extension of credit." *Id.* (emphasis in original). The 2010 amendments to the MCSBA provided that a credit services business shall not "[c]harge or receive any money or other valuable consideration in connection with an extension of credit that, when combined with any interest charged on the extension of credit, would exceed the interest rate permitted for the extension of credit under the applicable title of this article[.]" *Gomez*, 427 Md.at 167, 46 A.3d at 466. This amendment "merely clarifie[d] that all fees associated with a *payday loan* fall under the usury caps here in the State of Maryland." *Id.* (emphasis in original).

In 2010, the General Assembly also enacted legislation specifically to regulate RALs.

---

[21] A payday loan is defined as: "A small, short-term, unsecured loan with a very high annual interest rate." BLACK'S LAW DICTIONARY 1079 (Bryan A. Garner ed., 10th ed. 2014).

*Gomez*, 427 Md. at 173, 46 A.3d at 470. Observing that the MCSBA and the RAL legislation would impose contradicting requirements on a tax preparer who facilitates RALs, this Court concluded in *Gomez* that "the General Assembly never intended the [M]CSBA to apply to RALs."[22] 427 Md. at 177, 46 A.3d at 473. Against this backdrop, the "direct payment" requirement was an instinctive way to reflect the lack of legislative "intent to regulate income tax preparers that assist their clients receiving, through a third-party lender, a RAL, if they do not receive any payment directly from the consumer for that assistance." *Gomez*, 427 Md. at 169, 46 A.3d at 468.

Unlike Jackson Hewitt's facilitation of RALs in *Gomez*, CashCall's activities constitute the very "payday loans" that the General Assembly intended to prohibit. *See* discussion of the 2001 and 2010 amendments to the MCSBA, *supra*. A payday loan is: "A

---

[22] We provided the following examples:
> [I]f both the [M]CSBA and RAL statute apply, a consumer would have to be presented with two separate contracts—one for a RAL and one for credit services—in different fonts and including substantially different disclosures. *Compare* C.L. § 14–1906 *with* C.L. §§ 14–3804; 14–3806 . . . the [M]CSBA includes a three-day cancellation period, whereas the RAL statute requires that a RAL facilitator promptly process a RAL application. *See* C.L. §§ 14–1906(b); 14–3806(a)(6). Now, if under the [M]CSBA, a tax preparer must wait three days before processing an application, that wait would violate the RAL statute's requirement that the application be processed "promptly." If, however, a RAL application is processed promptly, yet a taxpayer decides to "cancel" a credit services agreement, there is really nothing to rescind. The processing has been completed once the application is electronically transmitted to a bank. It is therefore impossible for a RAL facilitator to comply with both the [M]CSBA and the RAL statute . . . .

*Gomez*, 427 Md. at176–77, 46 A.3d at 472.

small, short-term, unsecured loan with a very high annual interest rate." BLACK'S LAW DICTIONARY 1079 (Bryan A. Garner ed., 10th ed. 2014). The loans CashCall "marketed" meet this definition. Once again, we refer to the example of a typical transaction between CashCall and a Maryland consumer. CashCall offered unsecured loans of varying amounts. Where the consumer obtained a $2,600 loan, the stated interest rate was 99.24%. The short-term nature of the loan is clear because the expected date the consumer would receive funding was December 13, 2006 — the first payment was due on January 01, 2007, less than a month after the consumer received the loan. Commissioner Kaufman recognized the same and discussed the limits of *Gomez* in the Final Order:

> The Court in [*Gomez*] did not consider the circumstances in which the consumer engages in a single commercial transaction with the credit services business . . . . CashCall helped consumers obtain loans from out-of-state banks at rates that would otherwise be usurious under Maryland law . . . To make the applicability of the MCSBA contingent on whether a consumer has made a "direct" payment to CashCall would lead to absurd results.

Accordingly, it is appropriate to limit the "direct payment" requirement set forth in *Gomez* to "'mainstream' businesses that, like Jackson Hewitt, offer loan arrangement services as an ancillary service, separate and distinct from the principal services they provide to Maryland consumers." *CashCall, Inc.*, 225 Md. App. at 332, 124 A.3d at 681.

### CashCall engaged in a "credit services business"

A "credit services business" is

> any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services in return for the payment of money

23

or other valuable consideration:
> (i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record;
> (ii) Obtaining an extension of credit for a consumer; or
> (iii) Providing advice or assistance to a consumer with regard to either subparagraph (i) or (ii) of this paragraph.

CL § 14-1901(e)(1). Neither party disputes that CashCall "provid[ed] advice or assistance to a consumer with regard to . . . obtaining an extension of credit." *Id.* There is, however, a disagreement over whether CashCall provided such services "in return for the payment of money or other valuable consideration." *Id.* CashCall argues that it does not meet the definition of a "credit services business" because it did not receive any direct payments from consumers for the assistance it provided to consumers to obtain loans. According to CashCall, the phrase "in return for the payment of money or other valuable consideration" requires that the consumer make a direct payment to the person or company providing "advice or assistance to a consumer with regard to . . . obtaining an extension of credit." *Id.* As discussed above, the "direct payment" requirement discussed in *Gomez* is limited to the factual boundaries of that case.

The facts in the record establish that CashCall "provid[ed] advice or assistance to a consumer with regard to . . . obtaining an extension of credit." CL § 14-1901(e). CashCall marketed loans through television and internet advertisements, directed consumers to fill out loan applications through CashCall's website and forwarded completed loan applications to various out-of-state banks. These actions comprised the entirety of CashCall's business model and resulted in Maryland consumers obtaining short-term loans with interest rates that

24

greatly exceeded those permissible under Maryland law.

To be a "credit services business" the services "with respect to the extension of credit by others" must be provided "in return for the payment of money or other valuable consideration." CL § 14-1901(e). As we noted previously, "in return" means "in reciprocation, compensation, or repayment." MERRIAM WEBSTER COLLEGIATE DICTIONARY 1066 (11th ed. 2003). As the Commissioner contends, "CashCall did not perform these loan arrangement services in Maryland for free; it was amply compensated for its loan operation." In exchange for CashCall's role in assisting consumers to obtain the aforementioned loans, CashCall received, through contracts with the banks, the exclusive right to collect all payments of principal, interest and fees, including the origination fee. This arrangement, in essence, rendered CashCall the *de facto* lender. This is evident when we look at the fact that CashCall received payment from the consumer for the "origination fee." An "origination fee" is "[a] fee charged by a lender for preparing and processing the loan." BLACK'S LAW DICTIONARY 732 (Bryan A. Garner ed., 10th ed. 2014). Although the lending bank originally charged the origination fee, "[t]he bank never received payment of that fee from the consumer but, as noted, CashCall did." *CashCall, Inc.*, 225 Md. App. at 334, 124 A.3d at 682. Furthermore, CashCall's raison d'etre was to profit by purportedly providing advice and assistance to consumers in obtaining loans from the banks it had partnered with so that

25

it would receive, "in reciprocation" the legal right to receive payments from consumers.[23] MERRIAM WEBSTER COLLEGIATE DICTIONARY 1066 (11th ed. 2003). This arrangement proved to be a lucrative business for CashCall due to the high interest rates on the loans and the late fees it was entitled to charge. Because CashCall provided the consumer with "advice or assistance" in the obtention of an "extension of credit by others," and was compensated for doing so, we conclude that CashCall engaged in a credit services business. CL § 14-1901(e).

We now discuss whether there was substantial evidence in the record before Commissioner Kaufman to support his finding that "there was a direct payment from the consumer to CashCall in connection with obtaining the loan and that CashCall provided credit services to Maryland consumers." The Commissioner asserts that there was. We agree and conclude that CashCall is subject to the requirements of the MCSBA. Moreover, even if the payments had not been direct, there was substantial evidence in the record before Commissioner Kaufman that CashCall was engaged in a credit services business.

At the Exceptions hearing, the record before Commissioner Kaufman consisted of the

_____

[23] Commissioner Kaufman stated in his Final Order that the 2001, 2002, and 2010 MCSBA legislation indicates "on-going efforts by the General Assembly to protect Maryland residents from predatory lending practices of out-of-state banks partnering with "marketers" of high-interest, small-dollar loans." He concluded that "CashCall's activities fall squarely within the concerns and policies of the General Assembly" because it marketed and provided "substantial assistance to Maryland consumers who [were] looking for small-dollar consumer loans." These loans were short-term, came with high interest rates, and were often sought out by consumers "in response to desperate situations involving the death(s) of family members and the loss of employment."

26

Exceptions filed, the Proposed Decision, the Proposed Order, the transcript of the OAH proceedings in this matter, and all of the exhibits admitted at the OAH hearing.[24] The Consumer Loan Marketing, Origination, and Sale Agreement, between CashCall and First Bank & Trust of Milbank and the amendment to that agreement ("the Sealed Agreements") supported Commissioner Kaufman's conclusions that CashCall was "*obligated* to purchase the loans" and "upon assignment of a loan from the bank to CashCall, the bank's right, title and interest in the loans were assigned to CashCall." (emphasis in original). It also indicated that a "close review" of the Sealed Agreements "demonstrated that CashCall received fees directly from the consumers in connection with its role . . . . marketing and soliciting the loans and transmitting the application to the lender." These agreements further obligated CashCall "to repurchase the loans three days after the loans were disbursed." Commissioner Kaufman specifically refers to "the First Bank & Trust Promissory Note and Disclosure Statement, dated as of December 12, 2006" to explain how the consumers "paid fees directly to CashCall[:]"

> [F]or a $2,600 consumer loan[,] [t]he "financed" amount of the loan is shown as $2,525.00. This is the amount received by the consumer. A "Prepaid Finance Charge/Origination Fee" is listed at $75.00. The $75.00 fee is rolled into the principal amount of the loan. As a result, the total amount of principal

---

[24] The exhibits admitted by ALJ Paige, included a representative promissory note and disclosure statement and, admitted under seal were the Consumer Loan Marketing, Origination, and Sale Agreement, by and between First Bank & Trust of Milbank, and CashCall, dated as of August 2, 2006, and the First Amendment to the Consumer Loan Marketing, Origination, and Sale Agreement, by and between First Bank & Trust of Milbank, dated as of October 27, 2006.

27

due from the consumer is $2,600.00.

> In order to understand the significance of the $75 fee, one must turn back to the Sealed Agreements. Pursuant to the Sealed Agreements, when CashCall purchased a loan, CashCall paid for the outstanding balance due, including all principal, interest, origination fees, and other charges or sums owed by the borrower. In other words, CashCall paid $2,600 for the loan. Because the loan was transferred from the bank to CashCall three days later, the consumer did not make a single payment to the bank . . . . The consumer [] directly paid CashCall, not the bank, because CashCall collected on the loan, which included the $75.00.

> \*\*\*

> Here, the consumer paid CashCall for the principal, interest, and *fees* on the loan. Therefore, CashCall received direct payments from the consumer for fees in connection with the application and origination of the loan, as stated on the Promissory Note.

(footnote omitted) (emphasis in original). As the Final Order explained, there was ample evidence in the record to support the factual finding that Maryland consumers made "direct payments" to CashCall for assistance in obtaining an extension of credit. Therefore, we hold that there was substantial evidence in the record to support the Commissioner's finding that by collecting the full value of the loan, including the origination fee paid by the consumer, CashCall engaged in a "credit services business." In addition, we hold that even if the record did not establish that "direct payments" were made to CashCall, there was substantial evidence in the record to support the conclusion that CashCall's conduct met the definition of a "credit services business."

28

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY THE PETITIONERS.**